[Cite as *State v. R.J.C.*, 2024-Ohio-1670.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 21AP-651 |
| | | (C.P.C. No. 19CR-2060) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| [R.J.C.], | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on April 30, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Pritchard*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, R.J.C., appeals from the October 8, 2021 judgment of conviction entered by the Franklin County Court of Common Pleas after a jury found him guilty of felonious assault and the court sentenced him to an indefinite prison term of 7 to 10.5 years. Appellant argues his conviction is not supported by sufficient evidence and is against the manifest weight of the evidence. He also contends the indefinite sentencing scheme enacted by 2018 Am.Sub.S.B. No. 201 (the "Reagan Tokes Law") is unconstitutional.

{¶ 2} For the following reasons, we affirm the judgment below.

I. FACTS AND PROCEDURAL HISTORY

{¶ 3} By indictment filed April 26, 2019, plaintiff-appellee, the State of Ohio, charged appellant with felonious assault, in violation of R.C. 2903.11, a felony of the second degree. This charge related to an incident involving appellant and another individual, J.B.,

in the parking lot of the Inn Town Suites on the evening of April 17, 2019.  The two men did not know each other and first came into contact when appellant assaulted J.B.

{¶ 4}   The case proceeded to a jury trial on August 30, 2021.  Surveillance video played during trial showed appellant run up to J.B. and punch J.B. in the face, causing J.B. to fall to the ground in the hotel's parking lot.  It then showed appellant repeatedly strike and kick J.B. while J.B. was laying on the ground and attempting to shield himself from the blows.  We note the surveillance video from the hotel parking lot does not contain audio. The primary issue at trial was whether the April 2019 assault resulted from serious provocation by J.B. sufficient to warrant reducing the felonious assault offense to aggravated assault, a fourth-degree felony offense.[1]

{¶ 5}   In April 2019, appellant, his fiancée S.B., and their ten-year-old daughter N.B. were living at the Inn Town Suites hotel.[2]  Appellant and S.B. were both working at the time but had different work schedules and shared one vehicle.  Thus, appellant and N.B. would typically pick S.B. up from work in the evenings and return to the hotel together until appellant went into work on third shift.

{¶ 6}   On the evening of April 17, 2019, appellant and N.B. were in their hotel room together while S.B. finished her shift at work.  After showering, appellant sent N.B. out to the car ahead of him so he could get dressed for work.  (*See* Aug. 31, 2021 Tr. Vol. II at 169; *See* Sept. 1 & 2, 2021 Tr. Vol. III at 13-14.)

{¶ 7}   N.B. testified that, as she exited the hotel, a man—later identified as J.B.— greeted her and asked her to come over to him. (Tr. Vol. II at 169-70.)  Surveillance video showed N.B. and J.B. pass each other in the parking lot and N.B. look back at him for several

---

[1] Felonious assault is reduced to aggravated assault if the defendant assaulted the victim while "under the influence of sudden passion or in a sudden fit of rage * * * brought on by serious provocation occasioned by the victim." R.C. 2903.12(A). We have recognized that "aggravated assault is an inferior degree of felonious assault because its elements are identical to or contained within the offense of felonious assault, coupled with the additional presence of one or both mitigating circumstances of sudden passion or a sudden fit of rage brought on by serious provocation occasioned by the victim." *State v. Logan*, 10th Dist. No. 08AP-881, 2009-Ohio-2899, ¶ 12, fn. 1, citing *State v. Deem*, 40 Ohio St.3d 205 (1988).  *See also State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 37. To be serious, provocation must be " ' "reasonably sufficient to bring on extreme stress and * * * reasonably sufficient to incite or to arouse the defendant into using deadly force." ' " *Ferrell* at ¶ 37, quoting *State v. Saur*, 10th Dist. No. 10AP-1195, 2013-Ohio-1674, ¶ 31, quoting *Deem* at paragraph five of the syllabus. Notably, appellant's three assignments of error on appeal do not concern the predominate issue presented at his jury trial: whether the circumstances warranted reducing his second-degree felonious assault to the inferior degree assault offense.

[2] S.B. and N.B. have no relation to J.B.

moments before getting into the family's car.  (*See* Ex. E3; *See also* Tr. Vol. II at 90-93, 106-07, 122-23.)  It is unclear on the video footage, however, whether J.B. said anything to N.B. and, if he did, what was said.  (*See* Ex. E3; Tr. Vol. II at 91, 123.)  At trial, J.B. denied seeing—much less speaking to—N.B. in the parking lot before he was assaulted that night. (Tr. Vol. II at 138, 149-52, 162-63.)

{¶ 8}    On review, we note the hotel surveillance video showed J.B. walking around the hotel's parking lot throughout the evening of April 17, 2019.  (*See* Ex. E3.)  At trial, J.B. explained he generally walked a lot because he did not have access to a car and had a bad back.  (*See* Tr. Vol. II at 128-30.)  In addition to walking to work, J.B. also walked his wife to and from her second shift job. (*See* Tr. Vol. II at 128-29.)   And, like appellant, J.B. had been living at the Inn Town Suites hotel with his wife and child in the months preceding the April 2019 incident.  (Tr. Vol. II at 127-28.)

{¶ 9}    N.B. testified about being scared by her encounter with J.B. and fearing that he would follow her to the car.  (Tr. Vol. II at 169-71.)  After she got inside the car, N.B. locked the car's doors, crawled into the backseat, and crouched on the floorboards to hide. (Tr. Vol. II at 169-71.)   In that process, N.B. activated the car's alarm, prompting appellant to look out of his hotel room's window, realize the source of the alarm, and rush out to the car. (*See* Tr. Vol. III at 14; *See also* Tr. Vol. II at 170-71; Ex. E3.)

{¶ 10}  After finding N.B. seated on the backseat floorboards and crying, appellant asked her what was wrong.  (*See* Tr. Vol. III at 14-15; Tr. Vol. II at 171-72.)  N.B. told appellant about her encounter and described the man's clothing: a white T-shirt, blue jeans, and a black belt.  (*See* Tr. Vol. III at 15-17; Tr. Vol. II at 75, 172-73, 193-94; *See also* Ex. B.) We note N.B.'s description is consistent with the clothing J.B. can be seen wearing in the surveillance video from the night of the incident.  (*See* Ex. E3.)

{¶ 11}  Appellant attempted to locate the man by speaking with the hotel's security guard and asking other hotel guests if they had seen him.  (*See* Tr. Vol. III at 15-17; Tr. Vol. II at 80-83, 87, 172-73.)  Unable to find him, appellant and N.B. left the hotel to pick S.B. up from work. (Tr. Vol. III at 17; Tr. Vol. II at 172-73.)  Surveillance video showed J.B. walking around the hotel's parking lot several minutes after appellant and N.B. left. (*See* Ex. E3.)

{¶ 12} On the way back to the hotel, appellant and N.B. told S.B. about the incident. (Tr. Vol. III at 17; Tr. Vol. II at 192-93.) At trial, appellant explained he felt guilty for sending N.B. down to the car by herself and S.B. was upset with him for doing so. (Tr. Vol. III at 17-18.) The family returned to the hotel about 45 minutes after N.B. first encountered J.B. in the parking lot. (*See* Tr. Vol. III at 27; *See also* Ex. E3.) When the family entered the lobby, the security guard appellant previously spoke with told them he had not seen the man appellant described. (Tr. Vol. III at 18; Tr. Vol. II at 173, 193-94.) Thus, at appellant's suggestion, S.B. agreed to take N.B. to get food while appellant stayed back in the lobby with the security guard. (Tr. Vol. III at 18.)

{¶ 13} S.B. and N.B. were driving toward the hotel's exit when J.B. emerged from trees bordering the parking lot. (Tr. Vol. II at 173-74, 194-96; *See* Ex. E3.) Upon seeing the man, N.B. jumped out of her seat and hid on the floorboard of the car, prompting S.B. to stop the vehicle. (Tr. Vol. II at 173-74, 194-95.) S.B. testified the man approached the car, looked into its windows, and asked S.B. if she was looking for him. (Tr. Vol. II at 174, 195.) S.B. told the man to get away and called appellant to let him know "[t]he guy is out here standing by the car window." (Tr. Vol. II at 195-96. *See also* Tr. Vol. II at 174.) At trial, appellant described N.B. as scared and crying in the background during the call. (*See* Tr. Vol. III at 18. *See also* Tr. Vol. II at 195.)

{¶ 14} Appellant ran out to the parking lot and saw J.B. standing beside the passenger side of the family's car. (*See* Tr. Vol. III at 19; Ex. E1 at 22:29:20.) He testified that "fear and anger just went straight through [him] like a ball of rage" and described fearing for the safety of his family. (*See* Tr. Vol. III at 19-20.)

{¶ 15} The surveillance video showed appellant run up to J.B. and immediately punch him in the face, knocking J.B. to the ground. (Ex. E1 at 22:29:25; Ex. E3.) S.B. and N.B. drove away while appellant repeatedly punched and kicked J.B. in the head and torso. (*See* Ex. E1 at 22:29:33; Ex. E3.) The surveillance video showed appellant then pick J.B. up by his clothing, slam him back onto the ground, and kick him twice more. (*See* Ex. E3.) J.B. did not attempt to fight back. (*See* Ex. E3.) J.B. survived, but suffered substantial injuries including multiple facial fractures, eye trauma, and a ruptured eardrum. (*See* Ex. G.) At trial, J.B. testified that, during the assault, appellant repeatedly told him he was going to kill him. (Tr. Vol. II at 132-33, 136.)

{¶ 16} After the attack, J.B. walked to his wife's workplace and then walked back with her to the hotel, for an estimated total distance of 1.5 miles. (*See* Tr. Vol. II at 128-29, 158-59, 160-61.) J.B. explained he left the scene because the security guard—who observed the altercation but did not intervene[3]—told J.B. to "get up and leave" and appellant had threatened to "finish [him] off" if J.B. stayed at the hotel. (Tr. Vol. II at 137-38, 153, 159-60, 164; *See also* Ex. E3; Tr. Vol. II at 53-56.) The hotel's courtesy officer, Momodou Jallow, testified he called 911 shortly after the incident. (Tr. Vol. II at 33-34, 38, 55-56.)

{¶ 17} On the way back to the hotel, J.B.'s wife called the police. (Tr. Vol. II at 161.) Officers Edwin Ruhl and Shawn Elizondo responded to the hotel about an hour after the assault occurred. (*See* Ex. A; Ex. B; Ex. E3.) Medics also responded and treated J.B.'s left eye injury at the scene before transporting him to the hospital. (*See* Tr. Vol. II at 18-19, 23-24.) The state played footage without audio from Officer Ruhl's body camera for the jury at trial, which depicted the extent of J.B.'s injuries shortly after the assault. (*See* Ex. A; Tr. Vol. II at 17-23.) Appellant's statements to police at the scene were also presented to the jury when the state played footage from Officer Elizondo's body camera during trial. (*See* Ex. B; Tr. Vol. II at 75-83, 103-04, 109-11.)

{¶ 18} After the state rested, defense counsel moved for acquittal, pursuant to Crim.R. 29(A), arguing the state failed to show "enough that the victim had serious harm." (Tr. Vol. II at 210.) The trial court denied the defense's motion, noting testimony and evidence establishing that J.B. "was hospitalized for a couple of days, had a broken nose[,] [a]n eardrum crushed, so he was deaf for a while," sustained a broken jaw, and "was blind for a period of time in his left eye." (Tr. Vol. II at 211-12.) After resting, appellant's trial counsel renewed his motion for acquittal, which the trial court denied. (Tr. Vol. III at 65-66.) At the conclusion of the presentation of all evidence, the trial court instructed the jury on the elements of felonious assault and the inferior degree offense of aggravated assault. Following deliberations, the jury found appellant guilty of felonious assault.

{¶ 19} At the October 7, 2021 sentencing hearing, the trial court imposed an indefinite prison sentence of 7 to 10.5 years. The trial court memorialized appellant's conviction and sentence in its October 8, 2021 judgment entry.

---

[3] The police never interviewed the security guard about the incident and the security guard did not testify at trial. (*See* Tr. Vol. II at 107-08.)

{¶ 20} Appellant timely appealed from the judgment of conviction and raises the following three assignments of error for our review:

> [I.] THE TRIAL COURT ERRED WHEN IT DENIED [APPELLANT'S] RULE 29 MOTION FOR ACQUITTAL.
>
> [II.] THE VERDICT OF GUILT AS TO COUNT ONE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [III.] AS AMENDED BY THE REAGAN TOKES ACT, THE REVISED CODE'S SENTENCES FOR FIRST- AND SECOND-DEGREE QUALIFYING FELONIES VIOLATE THE UNITED STATES AND OHIO CONSTITUTIONS.

## II. ANALYSIS

### A. First and Second Assignments of Error

{¶ 21} Appellant's sufficiency and manifest weight challenges are closely related because they pertain to the same evidence supporting his felonious assault conviction. Accordingly, we address his first and second assignments of error together, while applying the distinct standards of review.

{¶ 22} Appellant was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another." "Serious physical harm to persons" is defined in R.C. 2901.01(A)(5) to mean any of the following:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**1. First Assignment of Error:  Sufficiency Challenge**

{¶ 23}  In his first assignment of error, appellant contends the state failed to prove the element of "serious physical harm."  Thus, he argues his felonious assault conviction was based on insufficient evidence and the trial court erred in denying his motion for acquittal.  We disagree.

{¶ 24}  The issue of whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.  *See*, *e.g.*, *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  We essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime. *State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, quoting *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41.  Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude the state proved each element of the offense beyond a reasonable doubt.  *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ 25}  Crim.R. 29(A) states, in pertinent part: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."

{¶ 26}  In support of his argument, appellant points out that J.B. "did not specifically indicate [during his trial testimony] which punches were to the head or stomach" and "failed to indicate if the kicks he suffered made contact with his head or stomach." (Appellant's Brief at 7, referencing Tr. Vol. II at 132-33.)  He also notes that J.B.'s hearing and sight returned within two weeks. (Appellant's Brief at 7, citing Tr. Vol. II at 142-43.) Appellant also notes that J.B. did not immediately seek medical attention after the assault

but, instead, walked to and from his wife's workplace, a total distance of more than one mile. (*See* Appellant's Brief at 7-8, citing Tr. Vol. II at 158-63.)

{¶ 27} But the jury viewed the surveillance video showing appellant punch J.B. in the face and then repeatedly punch and kick J.B. in the head and torso while J.B. was on the ground. (*See* Ex. E3.) The state presented photographs and testimony about puddles of blood observed in the area where J.B. fell after he was struck by appellant. (Ex. C4; Ex. C5; Tr. Vol. II at 104-05, 116-17.) The state also played the responding officers' body camera footage from the scene, which showed the extent of J.B.'s visible facial injuries shortly after the attack. (*See* Ex. A; Tr. Vol. II at 17-23; *See also* Tr. Vol. II at 34-36, 72, 78.) And the jury viewed photographs taken by police at the hospital that depicted injuries to J.B.'s face and body, including redness and swelling to his face, bruising to his left eye, and abrasions to his jaw, nose, left cheek, neck, and torso areas. (*See* Ex. D1 through D5.) Additionally, the state presented J.B.'s medical records to the jury, which described J.B. as having "severe face and left eye trauma" and indicated J.B. suffered multiple facial fractures, eye trauma, and a ruptured eardrum from the assault. (*See* Ex. G.) Finally, J.B. testified he was "totally deaf" in his left ear and "totally blind" in his left eye for several weeks after the assault. (Tr. Vol. II at 142-45, 148.) He also testified about experiencing pain in the two months following the incident while recovering from his multiple facial fractures. (*See* Tr. Vol. II at 148.)

{¶ 28} Based on the foregoing, we find the evidence sufficiently demonstrates that a temporary, substantial incapacity was inflicted upon J.B. that resulted in prolonged pain. Accordingly, we find the state presented sufficient evidence demonstrating that J.B. suffered serious physical harm, as defined in R.C. 2901.01(A)(5), from the unprovoked attack. *See*, *e.g.*, *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 15 (summarizing cases finding various injuries sufficient to support finding of serious physical harm). As such, the trial court did not err in denying appellant's motion for acquittal. Thus, appellant's first assignment of error is overruled.

## 2. Second Assignment of Error: Manifest Weight Challenge

{¶ 29} For his second assignment of error, appellant asserts his felonious assault conviction was against the manifest weight of the evidence because the state failed to prove serious physical injury. We disagree.

**{¶ 30}** A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See*, *e.g.*, *State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13 and *Thompkins*, 78 Ohio St.3d at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, quoting *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387.

**{¶ 31}** When considering an appellant's claim that a conviction is against the manifest weight of the evidence, we sit as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *See*, *e.g.*, *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10; *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

**{¶ 32}** This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact, *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus, and the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest," *State v. Antill*, 176 Ohio St. 61, 67 (1964). Further, to reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

**{¶ 33}** Appellant's manifest weight challenge concerns the same issue raised in his first assignment of error. He contends the greater amount of credible evidence

demonstrated that J.B.'s injuries did not rise to the level of "serious physical harm" necessary to sustain a felonious assault conviction under R.C. 2903.11. In support, appellant points out that J.B. did not lose consciousness, was not incapacitated, and did not suffer internal damage. (Appellant's Brief at 11.) He also notes that J.B. walked a considerable distance to meet his wife at work shortly after the attack. (Appellant's Brief at 11.) Appellant posits that "[n]o person suffering from serious physical harm would have been able to do that." (Appellant's Brief at 11.) But, it is unclear why appellant believes the injuries J.B. sustained to his face, eye, ear, and torso would necessarily prevent J.B. from walking. In any event, J.B. testified that he "didn't want to" leave the hotel but "had to" because the hotel's security guard ordered J.B. to leave and appellant threatened to "finish [J.B.] off" if he stayed. (*See* Tr. Vol. II at 164; *See also* Tr. Vol. II at 137-38, 153, 159-60.)

**{¶ 34}** Having reviewed all evidence and testimony presented at trial regarding J.B.'s injuries, as previously summarized above, we cannot conclude the jury clearly lost its way when it found the state proved the serious physical harm element of felonious assault beyond a reasonable doubt. Accordingly, we find the jury's verdict was not against the manifest weight of the evidence and overrule appellant's second assignment of error.

## B. Third Assignment of Error: Reagan Tokes Law

**{¶ 35}** In his third assignment of error, appellant argues the trial court erred in imposing an indefinite sentence under the Reagan Tokes Law because that law is unconstitutional. Appellant did not object to the application or constitutionality of the Reagan Tokes Law at trial and, thus, has waived all but plain error. *See, e.g.*, *State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, ¶ 7, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 16 (recognizing an appellate court has discretion to consider a forfeited constitutional challenge to a statute in a criminal case and may review the trial court's decision for plain error).

**{¶ 36}** To demonstrate plain error under Crim.R. 52(B), a defendant "must show that an error occurred, that the error was plain, and that the error affected his substantial rights." *State v. Bond*, 170 Ohio St.3d 316, 2022-Ohio-4150, ¶ 17, citing *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 52. *See also Buttery* at ¶ 7. The Supreme Court of Ohio has " 'interpreted [the third] aspect of the rule to mean that the trial court's error must have affected the outcome of the trial,' " *Bond* at ¶ 17, quoting *State v. Barnes*, 94 Ohio St.3d 21,

27 (2002), such that "reversal [is] necessary to correct a manifest miscarriage of justice," *see Buttery* at ¶ 7, citing *Quarterman* at ¶ 16.

{¶ 37} Effective March 22, 2019, the Reagan Tokes Law requires a sentencing court to impose an indefinite sentence consisting of a minimum and a maximum prison term on individuals convicted of first- or second-degree felonies for which life imprisonment is not an available sentence. *State v. Hacker*, 173 Ohio St.3d 219, 2023-Ohio-2535, ¶ 7, citing R.C. 2929.14(A)(1)(a) and (2)(a). R.C. 2967.271 specifies how the minimum and maximum prison terms affect the amount of time a defendant sentenced under the Reagan Tokes Law will be incarcerated. Generally, there is a rebuttable presumption that a defendant will be released from prison after serving the minimum term imposed by the sentencing court. *See* R.C. 2967.271(B). But the Ohio Department of Rehabilitation and Correction ("ODRC") "may rebut [that] presumption" if it—being the ODRC—"determines, at a hearing," that one of the conditions specified in R.C. 2967.271(C) apply. In that event, the ODRC "may maintain the offender's incarceration" up to the maximum prison term set by the sentencing court. R.C. 2967.271(D)(1).

{¶ 38} In this case, appellant was sentenced for felonious assault, a felony of the second degree. *See* R.C. 2903.11(D)(1)(a). Life imprisonment is not an available sentence for this offense. *See* R.C. 2929.14(A)(2)(a). Because the felonious assault offense was committed on or after March 22, 2019—when the Reagan Tokes Law took effect—the trial court was statutorily required to impose a mandatory "indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined pursuant to" R.C. 2929.144. *See* R.C. 2929.14(A)(2)(a). *See also Hacker* at ¶ 7.

{¶ 39} In accordance with that law, the trial court sentenced appellant to an indefinite prison sentence of 7 to 10.5 years. On appeal, appellant argues the trial court erred in applying the indefinite sentencing structure of the Reagan Tokes Law because the law is unconstitutional. More specifically, he contends the presumptive release portion of R.C. 2967.271 violates his constitutional rights to procedural due process and a jury trial, as well as the constitutional requirement of separation of powers.

{¶ 40} While this appeal was pending, however, the Supreme Court issued a decision finding the Reagan Tokes Law to be facially constitutional. *Hacker* at ¶ 41. Pursuant to

that decision, we reject appellant's constitutional challenge to the indefinite sentencing structure of the Reagan Tokes Law and find the trial court did not err in imposing the indefinite prison sentence that law requires. *See*, *e.g.*, *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 118; *State v. Burks*, 10th Dist. No. 21AP-657, 2024-Ohio-17, ¶ 55; *State v. Abdullahi*, 10th Dist. No. 21AP-350, 2024-Ohio-418, ¶ 54.

{¶ 41} For these reasons, appellant's third assignment of error is overruled.

## III. CONCLUSION

{¶ 42} Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

MENTEL, P.J., and BEATTY BLUNT, J., concur.