[Cite as *State v. Coffman*, 2026-Ohio-2383.]

THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                                    :

      Plaintiff-Appellee,                         :                    No. 23AP-555
                                               (C.P.C. No. 22CR-1517)

v.                                                               :

                                      (REGULAR CALENDAR)

Wayne C. Coffman,                                                :

      Defendant-Appellant.                        :

D E C I S I O N

Rendered on June 23, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, *Kimberly M. Bond*, and *Sheryl Prichard*, for appellee.

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Wayne C. Coffman, appeals from an August 21, 2023 judgment entry after being found guilty, pursuant to a jury trial, of attempted murder, felonious assault, and murder. For the reasons that follow, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2} On April 8, 2022, Coffman was indicted by a Franklin County Grand Jury on one count of attempted murder, a felony of the first degree, in violation of R.C. 2923.02/2903.02 (Count 1); felonious assault, a felony of the second degree, in violation of R.C. 2903.11 (Count 2); two counts of murder, unclassified felonies, in violation of R.C. 2903.02 (Counts 3 and 4); and having weapons while under disability, a felony of the third degree, in violation of R.C. 2923.12 (Count 5). Counts 1 through 4 each included 3-year firearm specifications in violation of R.C. 2941.145(A). The attempted murder and felonious assault charges concerned victim, A.S. The two counts of murder concerned the

deaths of victims, L.B. and M.B.  On April 14, 2022, Coffman entered a plea of not guilty and counsel was appointed in this matter.

{¶ 3}   This case proceeded to a jury trial on July 31, 2023.  Relevant to the instant appeal, the following facts were adduced at trial.

{¶ 4}   On March 11, 2022, at or around 12:30 a.m., A.S. arrived with a group of friends at Podunk's Bar.  (July 31, 2023 Tr. Vol. 1 at 270.)  At or around 1:21 a.m., Coffman arrived at the bar.  (Tr. at 271-272.)  At approximately 1:40 a.m., Coffman and A.S. engaged in a verbal argument.  (Tr. at 277-278.)  During the verbal exchange, Coffman proceeded to punch A.S. in the face.  A.S. then took off his jacket and attempted to reengage Coffman before the two were ultimately separated.  (Tr. at 279.)  The security video reveals the group shifted to the section of the bar by several pool tables where Coffman again punched A.S. and a physical altercation ensued.  (Tr. at 284-285.)  Other individuals grabbed pool cues, chairs, and a mop bucket and joined the fray.  (Tr. at 284-285.)  M.B., a security guard, sprayed mace in the area to break up the fight.  (Tr. at 281.)  As the altercation broke up, both individuals exited the bar.

{¶ 5}   Once outside, Coffman punched A.S. in the head from behind.  (Tr. at 295.)  Another fight involving multiple individuals ensued outside the bar.  (Tr. at 296.)  A.S. entered and exited the bar on two occasions before ultimately walking to his vehicle in the parking lot.  (Tr. at 296-297.)  Coffman went back into the bar and attempted to take the security guard's weapon.  (Tr. at 298.)  Around this time, M.B. went to his vehicle and retrieved a shotgun.  (Tr. at 297; 434, 436.)  Coffman proceeded to the parking lot and stood by M.B. pointing in A.S.'s direction.  M.B. entered further into the parking lot with the shotgun away from Coffman and A.S.  (Tr. at 312.)

{¶ 6}   During this time, A.S. stood with several individuals in the parking lot by a white van.  Coffman proceeded to walk toward the vehicle he arrived in and was handed a gun by an individual in a red hat.  (Tr. at 311.)  Coffman then walked into the parking lot toward A.S.  (Tr. at 311.)  Coffman, between an SUV and a sedan, raised his arm toward A.S.  (Tr. at 311-312.)  As a car passes, Coffman fired a gun in A.S.'s direction.  (Tr. at 315.)  A.S. was shot multiple times in his torso and leg area but survived.  (Tr. at 240.)  In response to Coffman's shots, the men behind A.S. returned fire at Coffman.  M.B. was shot and fell backward.  (Tr. at 314.)  A female patron at the bar, L.B., was also shot as she walked back into the bar during the altercation.  (Tr. at 304.)  Coffman fled to his vehicle and drove away

before law enforcement arrived at the scene. (Tr. at 316.) Coffman was taken to the hospital and treated for his injuries.

{¶ 7} Ronald Lemmon is a homicide detective for the Columbus Division of Police. (July 31, 2023 Tr. Vol. 1 at 85-86.) Lemmon interviewed Coffman at the Ohio State University Main Hospital Emergency Room regarding the incident. (Tr. at 87-88; 90.) According to Lemmon, Coffman was dropped off at the hospital with a gunshot wound in the same vehicle from the incident at Podunk's. (Tr. at 90.) Coffman stated there was a fight inside the bar that went outside into the parking lot. (Tr. at 92.) Coffman was shot during the altercation, but he denied that he fired a gun. (Tr. at 92.)

{¶ 8} Lemmon later a performed a gunshot residue ("GSR") test on Coffman. (Tr. at 93.) Lemmon recalled that Coffman was attached to medical equipment monitoring his vitals during the interview. (Tr. at 99.) Lemmon stated that "once I started performing the [GSR] test, his heart rate began to rise, causing the nurse to come in and check on him." (Tr. at 99.) Lemmon testified to hearing the heart rate alarm go off when asked about "firing a gun and taking the test[.]" ( Tr. at 99.) Lemmon collected Coffman's clothes before leaving the hospital. (Tr. at 105.)

{¶ 9} Detective Terrence Kelley is a homicide detective with the Columbus Division of Police. (Tr. at 235-236.) On March 11, 2022, Kelley responded to the incident outside of Podunk's. (Tr. at 236.) Kelley was the lead detective in the case and was tasked with "coordinat[ing] all the other detectives and the information incoming." (Tr. at 241.) Kelley described interviewing various witnesses and collecting surveillance videos from Podunk's and nearby establishments. (Tr. at 242-243.) Kelley denied that he was able to see the surveillance videos prior to the interviews. (Tr. at 243.)

{¶ 10} Kelley interviewed Coffman at Columbus police headquarters. (Tr. at 255.) According to Kelley, Coffman observed his cousin in an altercation at the bar and tried to intervene. Coffman again denied having a gun at the scene. Kelley took a buccal swab of Coffman as a DNA sample, which he sent to the lab. (Tr. at 259.) Law enforcement was unable to recover the firearm Coffman used during the incident. (Tr. at 261.) Kelley testified that the clothes collected from Coffman matched the individual on the surveillance video. (Tr. at 273.) According to Kelley, Coffman and A.S. had no prior relationship or "beef" before this incident. (Tr. at 278.) Kelley testified that Coffman, as seen in the surveillance video, initiated the altercation by striking A.S. in the bar. (Tr. at 279.)

According to Kelley, the video evidence showed Coffman "walk[] over towards the vehicle that he came in, [and] he encounters an individual. They both reach down. It appears as though he is handed a firearm at that point." (Tr. at 311.) At 1:44:57 in the video, Coffman fires the weapon at A.S. (Tr. at 312.) "You could see a [muzzle] flash right in here (indicating)." (Tr. at 312.) Kelley testified that, based on his training and experience, the return fire was in reaction to Coffman's initial shot. (Tr. at 316.) Kelley tried to recover the bullets that struck and killed M.B. and L.B., but the fragments were not suitable to be compared to any of the firearms recovered that night. (Tr. at 346.)

{¶ 11} On cross-examination, Kelley acknowledged that the security video does not capture every muzzle flash when a firearm is discharged. (July 31, 2023 Tr. Vol. 1 at 414.) While Kelley conceded that the muzzle flash from Coffman's firearm does not necessarily mean it was the first shot, he "didn't see any reaction until the majority of the rounds were fired, indicating to me that those would have been the first two shots." (Tr. at 419.) According to Kelley, the video "shows Mr. Coffman walking towards [A.S.], firing a shot, [A.S.] falling to the ground and then the remaining shots being fired after that." (Tr. at 457-458.) Kelley acknowledged that the video shows A.S. in the vestibule of the bar with something in his hand. (Tr. at 436, 466.) Kelley posited that A.S. could have been holding a cellphone or a wallet and not a gun. (Tr. at 468.)

{¶ 12} Dr. Daniel Davison is a forensic scientist at the Bureau of Criminal Investigation. (July 31, 2023 Tr. Vol. 1 at 112-113.) Davison performed the GSR testing in this case. (Tr. at 118.) Davison explained the testing and process leading up to his final review and report. (Tr. at 120-132.) Davison concluded that the GSR kit from Coffman was positive for particles that were characteristic of gunshot residue. (Tr. at 133.) Davison defined "positive" as "someone fired a gun or they were close to a gun that was fired or they handled something that already had gunshot residue on it; and then when they touched it, those small particles transferred from that item to them." (Tr. at 135.) Richard Bair is a detective in the crime scene search unit for the Columbus Division of Police. (Tr. at 143.) Bair responded to a call regarding a shooting with multiple victims at Podunk's. (Tr. at 145.) Bair described the scene as "extensive." (Tr. at 147.) Bair testified to the various photographs and items collected at the scene. (Tr. at 149-172.) In relevant part, Bair testified that out of the 127 items from the scene, 90 were shell casings. (Tr. at 172.)

{¶ 13} Dr. Russell Uptegrove is a forensic pathologist employed at the Hamilton County Coroner's Office. (Tr. at 351.) Uptegrove performed the autopsy of L.B. (Tr. at 354.) Uptegrove found that L.B. was struck twice, once was "[a] graze wound to the head and then that one to the abdomen." (Tr. at 381.) Uptegrove concluded, based on a reasonable degree of medical certainty, that L.B.'s cause of death was a perforated gunshot wound to the abdomen. (Tr. at 358.) Dr. Kent Harshbarger is a forensic pathologist and elected coroner for Montgomery County. (Tr. at 507.) Harshbarger performed the autopsy of M.B. (Tr. at 509.) Harshbarger concluded that M.B. died from a gunshot wound to the head. (Tr. at 511-512.)

{¶ 14} On August 7, 2023, the jury returned verdicts of guilty as to Counts 1 through 4 and the specifications. The trial court also found Coffman guilty as to Count 5 of the indictment.[1] The trial court held a sentencing hearing on August 18, 2023. At the conclusion of the hearing, the trial court sentenced Coffman to an aggregate term of life in prison with the possibility of parole after 39 years.

{¶ 15} Coffman filed a timely notice of appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Coffman assigns the following as trial court error:

> 1. The murder convictions (Counts 3 and 4) are not supported by legally sufficient evidence.
>
> 2. The murder convictions (Counts 3 and 4) are contrary to the manifest weight of the evidence.

## III. LEGAL ANALYSIS

### A. Coffman's First and Second Assignments of Error

{¶ 17} In Coffman's first assignment of error, he argues that the murder convictions were not supported by sufficient evidence. In Coffman's second assignment of error, he contends that the jury's guilty verdicts for the two counts of murder were against the manifest weight of the evidence. Because the arguments for both assignments of error are intertwined, we will address them together.

---

[1] Coffman waived his right to a jury trial as to Count 5. (Appellant's Brief at 5.)

### 1. Standards of Review

{¶ 18} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Rodgers*, 2026-Ohio-418, ¶ 32 (10th Dist.), citing *State v. Frazier*, 2025-Ohio-2992, ¶ 21 (10th Dist.), citing *State v. King*, 2025-Ohio-918, ¶ 19 (10th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 1.  As to the former, " 'whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial.' " *King* at ¶ 20, quoting *State v. Harris*, 2023-Ohio-3994, ¶ 14 (10th Dist.), citing *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.). When an appellate court reviews a sufficiency challenge, we assume the state's witnesses were truthful in their testimony and determine whether that testimony and any other evidence presented at trial satisfied each element of the offense.  *State v. Perry*, 2025-Ohio-2054, ¶ 58 (10th Dist.).  Legal sufficiency is a question of law that considers whether the state's evidence satisfies a " 'test of adequacy.' " *State v. Elkhabiry*, 2025-Ohio-1028, ¶ 45 (10th Dist.), quoting *Thompkins* at ¶ 23.  Thus, evidence is legally sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to find that the state proved each element of the offense beyond a reasonable doubt.  *Rodgers* at ¶ 32, citing *Perry* at ¶ 58.

{¶ 19} Conversely, a challenge under manifest weight concerns the evidence's effect in inducing belief.  *Rodgers* at ¶ 33, citing *Frazier* at ¶ 22, citing *State v. Thomas*, 2024-Ohio-5662, ¶ 16 (10th Dist.), citing *State v. Stewart*, 2024-Ohio-1448, ¶ 23 (10th Dist.), citing *State v. Cassell*, 2010-Ohio-1881, ¶ 38 (10th Dist.), citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25.  A manifest weight claim attacks the credibility of the evidence and considers whether the state has satisfied its burden of persuasion.  *King* at ¶ 22.  " 'Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis.' "  *State v. R.J.C.*, 2024-Ohio-1670, ¶ 30 (10th Dist.), quoting *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." *King* at ¶ 22, citing *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), citing *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.), citing *Thompkins* at ¶ 24.

{¶ 20} The manifest-weight-of-the-evidence standard requires a reviewing court to consider the state's evidence as an additional or "thirteenth juror." *Frazier* at ¶ 23, citing

*Elkhabiry* at ¶ 37, citing *Thompkins* at ¶ 25. " ' "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." ' " *Id.*, quoting *Elkhabiry* at ¶ 37, quoting *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at ¶ 25. Reversal under the manifest weight of the evidence is reserved for only exceptional matters "in which the evidence weighs heavily against the conviction." *Rodgers* at ¶ 34, quoting *Thompkins* at ¶ 25.

### 2. Sufficiency of the Evidence

{¶ 21} In his first assignment of error, Coffman contends that there was insufficient evidence presented at trial to convict him of the two counts of murder. Coffman first argues that there was insufficient evidence that he shot first as A.S. raised his arm toward Coffman as he approached, and Kelley's reliance on the muzzle flash was misplaced. Coffman also contends that there was insufficient evidence that the deaths of L.B. and M.B. were reasonably foreseeable and an inevitable consequence of his actions. (Appellant's Brief at 13-14.) Coffman posits that when A.S. obtained a firearm, it set into motion the events that resulted in L.B. and M.B.'s death. (Appellant's Brief at 17.) Coffman also takes issue with Kelley's investigation as he failed to recover multiple firearms or investigate which gun fired the bullets that killed L.B. and M.B. (Appellant's Brief at 18.)

{¶ 22} In relevant part, felony murder is defined as "caus[ing] the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree." R.C. 2903.02(B). At trial, Coffman conceded guilt as to the charges of attempted murder and felonious assault of A.S., which satisfies the predicate first-degree felony offenses of violence required under R.C. 2903.02(B). (Appellant's Brief at 11, citing Tr. at 83.)[2] The question becomes whether the deaths of L.B. and M.B were the proximate result of Coffman's actions in committing the underlying felony offenses.

---

[2] Felonious assault is defined as "knowingly . . . caus[ing] or attempt[ing] to cause physical harm to another . . . by means of a deadly weapon[.]" R.C. 2903.11(A)(2). Attempted murder is defined as "purposely or knowingly . . . engag[ing] in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).

**{¶ 23}** Ohio courts have observed that there are two theories regarding the crime of felony murder.  Under the "agency theory," the state must demonstrate "either the defendant, or someone acting in concert with him or her, killed the victim and that the killing occurred during the perpetration of and in furtherance of the underlying felony offense." *State v. Ford*, 2008-Ohio-4373, ¶ 31 (10th Dist.), citing *State v. Dixon*, 2002 Ohio App. LEXIS 472, *14 (2d Dist. Feb. 8, 2002), 2002-Ohio-541.  Under the "proximate cause theory" of felony murder, this court has explained:

> [I]t is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. A defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the 'proximate result' of defendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

(Further quotation marks deleted.)  *State v. Foster*, 2025-Ohio-1382, ¶ 32, quoting *Ford* at ¶ 31, quoting *Dixon* at *14.

**{¶ 24}** Based on the language employed in R.C. 2903.02(B), and "that the statute does not provide that the defendant or an accomplice must be the immediate cause of death, it is clear that Ohio has adopted the proximate cause theory." *State v. Howard*, 2025-Ohio-3281, ¶ 35 (8th Dist.), quoting *Ford* at ¶ 33.

**{¶ 25}** Upon review, a jury could reasonably conclude that Coffman fired the initial shots at A.S.  As captured on the video, Coffman's "muzzle flashed" as he fired the gun in A.S.'s direction resulting in injuries to A.S.'s torso and leg area.  (Tr. at 240; State's Ex. Podunk's 3 at 29:34.)  While Kelley acknowledged that the muzzle flash from Coffman's firearm did not necessarily indicate that it was the first shot, Kelley based his conclusion in part on the reactions of the bystanders immediately after Coffman's shot.  "I didn't see any reaction until the majority of the rounds were fired, indicating to me that those would have been the first two shots." (July 21, 2023 Tr. Vol. 1 at 419.)  The evidence that A.S. had a gun is mixed at best.  At trial, Kelley testified that the item in A.S.'s hand was not identifiable. (Tr. at 467.)  Kelley acknowledged that the video shows A.S. in the vestibule of the bar with something in his hand.  (Tr. at 436, 466.)  Kelley posited that A.S. could have been holding

a cellphone or a wallet.  (Tr. at 468.)  Even if A.S. was holding a firearm, the jury could reasonably conclude that based on the video evidence, Coffman fired his weapon first, which set into motion the gunfire that killed L.B. and M.B.  The video reveals that A.S.'s arms were at his side when Coffman first fired his gun.  (State's Ex. Podunk's 3 at 29:30.) The video evidence showing bystanders reacting after Coffman's shot only reinforces this conclusion.

{¶ 26}  We are not persuaded that the deaths of L.B. and M.B. were not reasonably foreseeable results of Coffman's actions. Our review of the video evidence and record reveals that Coffman was the initial aggressor throughout the evening as he repeatedly attacked A.S. inside the bar.  As the patrons exited the bar, Coffman resumed the altercation by punching A.S. from behind.  The video shows that once Coffman obtained a firearm, he walked toward A.S., raised the firearm, and fired in A.S.'s direction.  Given the multiple physical altercations and violent tension building that night, it is reasonably foreseeable that when Coffman fired his weapon at A.S., the other individuals would shoot back in response.  This court has repeatedly affirmed felony murder convictions in cases where the defendant's actions created a foreseeable risk of death during the commission of the underlying felony offense.  *See, e.g.*, *State v. Long*, 2021-Ohio-2656, ¶ 37 (10th Dist.) (finding that as "appellant was committing aggravated burglary and/or aggravated robbery, armed with a weapon, with the objective to steal the firearms in the home, when the occupants were known to be present, it is a direct, natural, and reasonably foreseeable consequence that such actions would result in the death of another."); *Ford* at ¶ 50. Furthermore, Ohio courts have repeatedly affirmed convictions under a proximate cause theory that a defendant's actions created a foreseeable risk that another party would return fire.  *See, e.g.*, *State v. Creer*, 2025-Ohio-1180, ¶ 90 (8th Dist.).  "[T]he risk of serious physical harm or death to any person present, be it the intended victims, bystanders, or the wrongdoers themselves, becomes highly foreseeable."  (Further quotation marks deleted and citations omitted.) *State v. Wood*, 2025-Ohio-1182, ¶ 117 (8th Dist.) In *State v. Catron*, 2015-Ohio-2697 (8th Dist.), the Eighth District Court of Appeals addressed a similar fact pattern.  A brief review is instructive.

{¶ 27}  In *Catron*, the defendant was charged with felony murder involving the death of a neighbor.  *Id*. at ¶ 16.  At trial, various witnesses testified that the defendant drew a gun on his brother, and the two began shooting across the street when shots struck and killed a

neighbor. *Id.* The Eighth District affirmed the defendant's conviction for felony murder despite testimony that the neighbor was struck from shots derived from the brother's position across the street. *Id.* The *Catron* court explained that because the defendant initiated the shooting, "[i]t was reasonable for the jury to conclude that [the defendant's] firing of his weapon created a foreseeable risk that the brother would fire back, and thus cause the death of the innocent third-party victim." *Id.*

{¶ 28} The repeated altercations at Podunk's created a powder keg of tension. When Coffman shot at A.S., it lit the fuse triggering a barrage of gunfire that resulted in the deaths of L.B. and M.B. To be sure, Kelley was not able to obtain the firearms used in the altercation or identify the shooters that killed L.B. and M.B. However, Kelley explained that he tried to recover the bullets that struck and killed L.B. and M.B., but the fragments were not suitable to be compared to any of the firearms recovered that night. (July 31, 2023 Tr. at 346.) In any case, these alleged deficiencies are largely irrelevant to the state's proximate cause theory of felony murder. Coffman's act of drawing his weapon and firing at A.S. created a foreseeable risk that A.S. or his companions would return fire and cause the deaths of two innocent third-party bystanders.

{¶ 29} Coffman next argues the trial court erred by allowing Lemmon's testimony regarding his interview of Coffman at the hospital. Coffman contends that Lemmon's testimony regarding his heart rate amounts to "junk science" and is unreliable. (Appellant's Brief at 23.)

{¶ 30} As an initial matter, Coffman's defense counsel failed to object to Kelley's testimony during the trial. As such, Coffman has forfeited all but plain error review of this issue. *State v. Sims*, 2016-Ohio-4763, ¶ 9 (10th Dist.), citing *Boone*, 2015-Ohio-2648, at ¶ 35 (10th Dist.) (concluding that failure to object to testimony forfeits all but plain error review). "To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial." *Id.*, citing *State v. Barnes*, 2002-Ohio-68. Arguendo, even if it was an obvious error to allow Lemmon's testimony, given the breadth of video evidence and the positive GSR test, we cannot find that the admission of such testimony affected the outcome of the trial. As such, any error derived from the inclusion of Lemmon's testimony regarding the heart rate monitor was harmless. *See* Crim.R. 52(A).

{¶ 31} Finally, Coffman takes issue with Kelley's "demonstrable subpar investigation into the event." (Appellant's Brief at 16.) Coffman argues that the state failed to present legally sufficient evidence that L.B.'s and M.B.'s deaths were foreseeable as there was not a single witness to the events. (Appellant's Brief at 14-15.) Coffman contends that because A.S. and other witnesses were not called or did not appear, the state failed to address many important questions in the case.

{¶ 32} We find Coffman's argument unpersuasive. The record shows that A.S. was scheduled to testify at trial but did not appear. The trial court later ordered a warrant for A.S.'s arrest for failure to comply with a court order. Regardless, the record provides sufficient evidence to support the jury's verdicts of murder. Concerning Coffman's additional arguments as to Kelley's investigation, Coffman's trial counsel had the opportunity to cross-examine the detective as to any potential shortcomings of his investigation. This court has found that arguments regarding inconsistent evidence and witness credibility are matters relevant to the weight, rather than the sufficiency, of the evidence. *State v. Hardy*, 2024-Ohio-5926, ¶ 43 (10th Dist.). As such, the jury was best positioned to resolve these purported deficiencies in the investigation.

### 3. Manifest Weight

{¶ 33} Coffman's arguments under manifest weight largely mirror those presented regarding the sufficiency of the evidence. Coffman argues that the state's evidence, as it relates to the escalated conduct after the initial bar fight, was uncertain and contradicted by testimony at trial. (Appellant's Brief at 24.) Coffman contends that the murder convictions were against the manifest weight of the evidence based on Kelley's inconsistent testimony and lack of credibility, "Lemmon's testimony about the pseudo-polygraph test was unreliable," and Kelley's rush to charge Coffman after "quickly reviewing security video, without a decerning eye to the details." (Appellant's Brief at 25-26.)

{¶ 34} We have previously found that a conviction is not against the manifest weight of the evidence because the jury elected to believe the state's version of events over the defendant's version. *Rodgers* at ¶ 48, citing *State v. Abdullahi*, 2018-Ohio-5146, ¶ 30 (10th Dist.), citing *State v. Hawk*, 2013-Ohio-5794, ¶ 59 (10th Dist.). In addition to the reasons provided that the state presented sufficient evidence at trial, we note that even if we accept that there was conflicting evidence, given the facts of this case, we find the jury was in the best position to evaluate Kelley's credibility and resolve the central and disputed facts.

Based on our careful review of the record, most notably the video evidence, we cannot conclude that the jury clearly lost its way by convicting Coffman of the two counts of felony murder.  Accordingly, Coffman's first and second assignments of error are overruled.

## IV.  CONCLUSION

{¶ 35} Having overruled Coffman's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and DORRIAN, J., concur.

_____