[Cite as *State v. Wood*, 2025-Ohio-1182.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                        No. 114064

    v.                           :

DREQUAN WOOD,                           :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN
PART AND REMANDED
**RELEASED AND JOURNALIZED:** April 3, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-689050-C

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Jeffrey S. Schnatter and Margaret Graham,
Assistant Prosecuting Attorneys, *for appellee.*

Erin E. Hanson, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Drequan Wood ("Wood"), appeals his convictions for felony murder and various firearm-related offenses. For the following reasons, we affirm the trial court's judgment, in part, vacate the judgment, in part, and remand this case to the trial court.

## I. Facts and Procedural History

{¶ 2} In the early morning hours of March 26, 2023, Derrion Miller ("Miller") was killed in a drive-by shooting at 6970 Kinsman Road in Cleveland, Ohio. On February 21, 2024, Wood, along with codefendants Andre Q. Pettaway, Jr. ("Pettaway") and Michael J. Creer, Jr. ("Creer"), were indicted for various felony offenses related to the murder of Miller. Specific to this appeal, Wood was charged with one count of felony murder, one count of felonious assault, six counts of improperly discharging a firearm at or into a habitation, one count of discharge of a firearm on or near prohibited premises and one count of having weapons while under disability. Most of the charges against Wood included one-, three-year and five-year firearm specifications.

{¶ 3} On April 29, 2024, the case proceeded to a jury trial on all charges except having weapons while under disability, which was tried to the bench. On May 9, 2024, Wood was convicted of felony murder with one-, three- and five-year firearm specifications, five counts of improperly discharging a firearm at or into a habitation with one-, three- and five-year firearm specifications and having weapons while under disability. The remaining counts against Wood were dismissed.

{¶ 4} On May 15, 2024, the court held a sentencing hearing and merged the five counts of improperly discharging a firearm at or into a habitation with the murder count. The State elected to proceed to sentencing on the murder conviction. The court sentenced Wood to an indefinite term of 26-years-to-life in prison,

consisting of a 15-years-to-life sentence for murder to run consecutive to 11 years in prison for three of the firearm specifications.

{¶ 5} Wood appeals his convictions assigning the following errors for our review:

> I. The trial court erred by failing to instruct the jury on independent intervening cause of death.
>
> II. The trial court erred by denying appellant's motion to dismiss Count 1 [felony murder] of the indictment.
>
> III. The verdicts were not supported by sufficient evidence.
>
> IV. The verdicts were against the manifest weight of the evidence.

## II. Trial Testimony

### a. Background

{¶ 6} Prior to setting forth individual testimony, our review of the trial transcript shows all witnesses who testified about the following facts testified consistently. At the time of the shooting, Shardasia Cannon ("Cannon") and her children lived at 6970 Kinsman Road in Cleveland ("Cannon's house"), which is a Cuyahoga Metropolitan Housing Authority ("CMHA") two-story townhouse. Behind Cannon's house is a parking lot.

{¶ 7} Cannon, Miller, Shaniya Alston ("Alston"), Kaevonna Smith ("Smith") and Brandon Abercrombie ("Abercrombie") (collectively, the "Group") were together on the night of March 25, 2023. First, they were at Cannon's house. Next, they all went to a birthday party at a relative of Abercrombie's. In the early morning hours of March 26, 2023, the Group went back to Cannon's house where Cannon

prepared some food in the kitchen. Alston, Miller, Smith and Abercrombie went into the living room. Smith, who was pregnant with Miller's child, lay down on a couch, Alston sat on a couch and Miller and Abercrombie sat in chairs and played video games. Cannon came into the living room with chicken nuggets and sat on one of the couches. Shortly after the Group arrived back at Cannon's house, multiple shots were fired into the back of Cannon's house. A bullet struck Miller, and he was killed.

{¶ 8} Rayshawn Wicks ("Wicks"), who is Cannon's ex-boyfriend, and Abercrombie had an altercation at Cannon's house on March 25, 2023, which is the day before the shooting.

{¶ 9} Of the surveillance videos admitted into evidence at Wood's trial, only one was from a CMHA camera. This CMHA video is the only video to show the shooting and this CMHA video is "of somewhat less than ideal quality." Specifically, the video is dark, and the camera captured "eight frames a second," which is a low "frame rate." The "higher the frame rate, the better that image is going to be . . . the more action you'll be able to see. A slower frame rate means that there's parts . . . that aren't . . . recorded."[1]

### b. Shardasia Cannon

{¶ 10} In the early morning hours of March 26, 2023, the Group arrived at Cannon's house after being out "[a]round like 2:40, the latest three, somewhere

---

[1] This technical description of the low quality of the CMHA video is taken from the testimony of the State's witness Tom Ciula, who formerly "ran the forensic video lab for the homicide unit" at the Cleveland Division of Police.

around there." Cannon testified that the stairs to the second floor of her house are "[r]ight at the front door." Cannon testified that, after they had been home "not even an hour, . . . out of nowhere shots just get to going off." According to Cannon, Abercrombie had a gun at the time.

{¶ 11} Cannon testified that Alston "dropped down to the ground" and Miller and Abercrombie "started running upstairs." Cannon told Alston to get up and they also went upstairs. Smith was "still laying on the couch asleep." Realizing this, Miller turned his body and told Smith, "[G]et up, don't you see these bullets flying." While the Group was still on the stairs, Miller told Cannon that "he felt like he got hit." According to Cannon, Abercrombie went up the stairs first, followed by Miller.

{¶ 12} Cannon testified that there were "bullets flying from upstairs, too, so [Abercrombie] came back down . . . ." Cannon further testified that at one point, Abercrombie went back downstairs by himself to see if anyone had entered Cannon's house. Asked where the bullets were coming from, Cannon answered, "From outside." Cannon testified that she did not see who was shooting from outside. Smith called 911 and EMS arrived, followed by the police. Cannon told the police that Wicks did "this" because there was "an altercation earlier . . . with [Wicks] and" Abercrombie.

{¶ 13} Cannon testified that Wicks texted her that "he was basically going to come back and shoot up the house." Cannon further testified that Wicks and Miller spoke on the phone and Wicks "was saying the same thing" to Miller. According to

Cannon, "at the end of [Wicks'] and [Miller's] conversation [Wicks] wasn't going to do it because the kids lived there."

{¶ 14} Cannon identified a man in pictures that the police later showed her as someone she knew by the name of "Sav." Cannon made an in-court identification of Sav as Wood. Cannon also identified pictures of Pettaway, who she knew as "Dre" and Creer, who she knew as "Juice," and testified that she either knew them personally or knew of them through friends on social media.

{¶ 15} Cannon testified that the shots fired that morning came from the back of her house, passed through the kitchen and living room and went "out the front of the house."

{¶ 16} On cross-examination, Cannon testified that her children were not in the house at the time of the shooting because they had spent the night at their grandmother's home. Cannon testified about shell casings that police found inside her house after the incident. Cannon did not know who fired the gun inside her house that left the casings and she could not say "for sure" whether the casings were from bullets "shot that night." According to Cannon, her ears were ringing from the gunfire and she could not tell the difference between shots fired from outside her house and shots fired from inside her house. Cannon testified that Abercrombie had a gun "[i]n his pants" when the shooting occurred but she was not sure if the gun remained "in his pants" the whole time. Cannon stated, "I was worried about my sister. I thought she got hit." Cannon did not see anybody fire a gun that morning.

{¶ 17} Cannon testified that Miller "was in the middle of the living room" when he got shot. According to Cannon, while they were running upstairs, they saw that Smith was still asleep. Miller "turned his whole body. So in order for him to turn his whole body, it would only hit that side that he got hit on." Cannon further testified that she did not see Miller get shot and agreed that she was "just speculating or guessing at what point he was actually hit."

{¶ 18} Cannon testified that she knew Wood and had seen him a week before the shooting occurred. Cannon agreed that she did not have "any beef" with Wood. Asked if, when the shooting occurred, Wood's name "came to her mind," Cannon replied, "No."

{¶ 19} Asked if, to her knowledge, "the only person with a gun at your residence that night was" Abercrombie, Cannon answered, "Yes." Asked "if somebody fired a weapon that night, it had to have been [Abercrombie] inside of your house," Cannon answered, "Yes."

{¶ 20} Cannon testified that, although she did not see Abercrombie fire a gun, she "learned" that he fired a gun "before they went upstairs" because Abercrombie told her this on the same day as the shooting. She also "learned" that, when Abercrombie fired the gun, he was standing next to Miller. Cannon testified that she did not tell the police this because she was afraid Abercrombie would "go to jail" because he is "not allowed to have a gun."

### c. Kaevonna Smith

{¶ 21} Smith testified that she fell asleep on the couch at Cannon's house in the early morning hours of March 26, 2023. According to Smith, she awoke "[w]hen the dust of the bullets being fired falling on my face." Smith heard "a lot of" gunshots and Abercrombie told her to run upstairs. Smith described the scene as follows: "I'm seeing like a lot of dust, like a lot of like stuff going through the wall, like the plaster of the wall coming out, it's like white everywhere and it's like messy a lot. That's all I seen. Afterwards [Abercrombie] told me to run and I ran upstairs." Smith testified that Cannon and Miller were the first to make it up the stairs. When Smith got upstairs, Cannon and Miller were in the bathroom. Miller "is hovering over the tub. [Cannon] is in the back of him holding him." According to Smith, Miller "said he was hit. And I asked him where. He showed me. I pulled down his pants. I took off my jean jacket and I put it on there . . . to know he wasn't bleeding out."

{¶ 22} Smith "panicked" and called Miller's relatives. Then she called 911, and Cannon took over that call because Smith was "panicking." Emergency Medical Services ("EMS") and police arrived. Smith and the others were told to go outside. Smith testified that she did not know what happened after that.

{¶ 23} According to Smith, she and Miller shared a phone. On this phone were text messages between Miller and Wicks from March 25, 2023. Smith saw these messages prior to the shooting. Smith showed these messages to the police. She testified as to one particular message from Wicks at 6:31 p.m. that said, "You all

dead in that b***h." Miller responded with a text that said, "Get your lick back now." Smith testified that she was not aware of what caused Wicks to send those "threats."

{¶ 24} Smith testified that she did not see anyone with a gun at Cannon's house, but Abercrombie "probably" had one. Asked why she said that, Smith replied, "I don't know. You know, everybody said they got a gun. You know how that go." According to Smith, Miller did not own a gun and he did not fire a gun that morning. Smith testified that the shots were coming from outside and she was not aware of anyone shooting from inside the house. Smith testified she spoke with a detective after the incident and said, "I was asleep, when I woke up there was a lot of stuff going on and I was shocked and scared." According to Smith, she did not "see anybody who did the shooting."

{¶ 25} Smith testified that she knew Wood, Pettaway and Creer and they "used to be" her friends. She did not know of any issues the defendants had "with anybody inside that house."

{¶ 26} On cross-examination, Smith was asked if, "when this shooting occurred did [Wood's] name even enter your mind at all." Smith answered, "No. No names entered my mind at all." Smith was also asked if she learned "after the fact" that somebody fired a weapon from inside Cannon's house. Smith answered, "No."

### d. Shaniya Alston

{¶ 27} Alston testified that about 30 to 40 minutes after the Group arrived at Cannon's house, "[r]andom bullets just flying through the house." Specifically, Alston testified as follows: "First we heard glass breaking, and then we like, oh, we

all like panic, where is it coming from. And then it just more and more and more and more and more start coming from upstairs, downstairs. And I just fell to the ground."

{¶ 28} Cannon, Miller and Abercrombie began to run upstairs, but they stopped in the middle of the staircase because "they didn't want to get hit with those bullets coming upstairs and downstairs at the same time." Smith was asleep on the couch. Miller went back down the stairs to awaken Smith. Miller walked toward Smith and, according to Alston, "I guess he got shot." At that time, Abercrombie was on the bottom of the staircase by the front door. According to Alston, Abercrombie had a gun that night because he "always had a gun," but she did not see him "do anything with that gun." Asked if he "pulled his gun," Alston answered, "He had it in his hand." Alston testified that she did not see Abercrombie fire the gun.

{¶ 29} According to Alston, the Group went upstairs at that point. Alston testified that she was still hearing gunshots the "[w]hole time. 56 shots." According to Alston, the shots were coming from the "back. They flew into the shower. They were everywhere; the refrigerator, the stove, the upstairs." 911 was called and EMS and police arrived.

{¶ 30} When Alston went back downstairs, she observed shell casings inside the house in the kitchen and by the staircase.

{¶ 31} Subsequent to the shooting, Alston identified Pettaway and Wood, whom she knew, by photographs of them shown to her by police. Alston testified

that she did not know Creer. At the time, Alston "was kind of confused" because "they thought it was somebody dealing with [Wicks] because he was to retaliate" against Abercrombie. Alston did not think the three males in the photographs had anything to do with the shooting at Cannon's house. According to Alston, she did not have "any beef" with Wood nor did anyone else in the Group.

{¶ 32} On cross-examination, Alston testified that she heard someone shooting from within the house that morning. Alston next testified about whether she told the police this at the scene and was shown video from an officer's body camera depicting Alston answering officers' questions after the shooting. Officers asked whether anyone inside the house fired a weapon. Alston answered, "No." Alston testified that she did not lie to the police because she took the question "as if I was shooting the gun. I did not shoot the gun, so I said, no." Alston admitted that she did not "offer any information" to the police about Abercrombie firing a weapon.

### e. Dimitri Blackwell

{¶ 33} Dimitri Blackwell ("Blackwell") testified that he is a police officer with the City of Cleveland. In March 2023, Blackwell was a patrol officer working from 10:00 p.m. to 8:00 a.m. At approximately 3:00 a.m. on March 26, 2023, he received a radio call for service at Cannon's house. He arrived at the scene and went into Cannon's house through the front door. Blackwell went upstairs and found Miller, who had been shot, on the bathroom floor. EMS began attending to Miller. Miller was unconscious but still breathing. Blackwell spoke with Cannon, Smith and Abercrombie. Blackwell's understanding of what occurred was that "an unknown

person or amount of people shot a firearm multiple times through the interior of that residence." Blackwell "saw apparent bullet holes all throughout the living area, kitchen and living room of the residence." According to Blackwell, "multiple shell casings were recovered on scene in the south side parking area." Asked if police had a suspect at that point, Blackwell replied, "No aside from an unidentified male by the name of Rayshawn."

{¶ 34} Blackwell testified that there "was at least one casing inside the house" on the first floor, indicating to him that "possibly a firearm had been discharged somewhere in that area inside." However, Blackwell did not learn through his investigation that a gun was fired from inside the house.

### f. Vesna Piscitello

{¶ 35} Vesna Piscitello ("Piscitello") testified that she is employed as a civilian analyst with the Cleveland Division of Police in the Real Time Crime Center ("RTCC"). One of her job duties is to review RTCC video footage from "over a thousand [cameras] around the City." Piscitello reviewed video footage in a homicide investigation in March 2023. Piscitello testified that the police had "a suspect vehicle . . . and a direction of travel and a time frame." According to Piscitello, the vehicle of interest was a Kia Sportage (the "Kia"). Piscitello was instructed to review footage from RTCC cameras located in the area of Cannon's house in the early morning hours of March 26, 2023.

{¶ 36} Piscitello first located the Kia driving north on E. 93rd Street near Benham Avenue at approximately 2:12 a.m. There is an RTCC camera "facing

eastbound on Kinsman Road. Facing towards East 70th Street." There is another camera "at Kinsman and Sidaway facing southwest." Piscitello testified that the Kia "passes the area and then conducts a U-turn near East 69th Street and travels back eastbound." The Kia initially passed Cannon's house, made a U-turn and headed back toward Cannon's house.

{¶ 37} After the shooting, RTCC cameras capture the Kia at 2:57 a.m. traveling west on Kinsman, pulling into a Shell gas station on E. 55th Street at 2:58 a.m. and pulling into a Rapid Stop gas station, also on E. 55th, at 3:13 a.m. The videos show three people getting out the of Kia. One of the videos shows the driver of the Kia "wearing red and hav[ing] a hood on." Piscitello relayed this information to the police so they could "obtain additional videos from the" Shell and Rapid Stop gas stations.

{¶ 38} Also as part of this investigation, Piscitello downloaded the contents of Wicks' and Creer's cell phones and "looked into social media" accounts for Miller, Wicks, Wood, Pettaway and Creer.

{¶ 39} On cross-examination, Piscitello testified that the City of Cleveland's license plate readers were not utilized as part of the investigation regarding the Kia. Rather, her identification of the Kia was based on "that looks like a similar car, at a time where it makes sense it would be on this camera." Piscitello further testified that "in some circumstances where there's continuous camera coverage, you're pretty much able to tell the travel path and if it turns off somewhere."

{¶ 40} Piscitello testified that she also viewed the surveillance videos police obtained from the Shell and Rapid Stop gas stations. According to Piscitello, the people getting out of and into the Kia at the gas stations were consistent with the "images of the people" that she saw on Wood's, Creer's and Pettaway's social media pages. For example, one of the people at the gas station in the surveillance videos was in "all red, . . . a red hood with a long sleeve red on" and, on one of the social media accounts, "the individual in all red had a picture posted wearing the same clothing as in the gas station video."

{¶ 41} The Kia is last seen leaving the Rapid Stop gas station "at approximately 3:26 hours. It travels northbound on East 55th Street and it turns westbound onto Superior Avenue. And it's last seen entering I-90 westbound at about 3:29 hours."

### g. Walter Emerick

{¶ 42} Walter Emerick ("Emerick") testified that he is a crime scene detective for the City of Cleveland Division of Police. In the early morning hours of March 26, 2023, Emerick was called to the scene of a shooting at Cannon's house. Emerick testified that the police found 41 "spent cartridge casings . . . located on the ground in the parking lot . . . which is indicative of where somebody was standing shooting a firearm." Emerick further testified that there were "quite a few holes on the whole back side of the house," including bullet defects to doors, windows, walls, cabinets and even the refrigerator. Emerick also testified that five spent cartridge casings

and one bullet fragment were found inside Cannon's house. According to Emerick, all cartridge casings that were found at the scene were 9 mm.

### h. Tom Ciula

{¶ 43} Tom Ciula ("Ciula"), who retired from the Cleveland Division of Police the day before he testified at Wood's trial, stated that he previously "ran the forensic video lab for the homicide unit." Ciula testified that he collected videos related to this case and reviewed each one "forensically to see exactly what it shows, to see how it applies to a particular case. And then we try to do as much clarification to that video that can be done to tell the story of what occurred on a given situation." Specifically, Ciula reviewed videos from Kinsman Express Beverage, RTCC, CMHA, the Shell gas station and the Rapid Stop gas station. According to Ciula, he was "following a vehicle" in these videos and "trying to identify individuals associated with the vehicle." Ciula testified that there "were three persons of interest associated with" this case. "The first person of interest . . . is wearing pretty much all red. The second person of interest . . . is wearing a tricolored jacket, stripes in a horizontal pattern from top to bottom. And the third person of interest is wearing a gray hoody."

{¶ 44} Ciula testified that the "CMHA video was of somewhat less than ideal quality. . . . We see [the Kia] . . . pull up in an area at CMHA . . . . During that period what are observed are flashes from the driver's side area of that car."

{¶ 45} According to Ciula, "the person in red is behind the driver's wheel[,]" the person "in the gray hoody is in the front seat, passenger side" and the person in

the tricolored jacket "is in the backseat." The Kia is seen in the RTCC videos at 2:12 a.m. and at the Kinsman Beverage Center at 2:13 a.m. RTCC videos show the Kia at 2:51 a.m. and again at 2:54 a.m. A "little less than two minutes" later, the Kia is picked up by the CMHA camera, and this is when Ciula observed "muzzle flashes." Ciula testified that these four "flashes of light" came from the driver's side of the Kia. "Could that flash be coming from someone in the back seat reaching forward? Yes. Could that flash also be coming from someone in the front seat reaching backward? Yes. There is insufficient detail in this video to say with certainty exactly where those flashes are coming from. But it is from that vehicle and it is from the driver's side." According to Ciula, the fact that the CMHA video captured four muzzle flashes "does not have anything to do with how many times a weapon may or may not have been fired. It's just those are the four that were captured on a video frame."

{¶ 46} The Kia is next seen in the surveillance video at the Shell gas station. The individual in red is seen driving the Kia in this video, and the person in the gray hoody exits the vehicle from the front passenger seat. The Kia is followed by RTCC cameras until it arrives at the Rapid Stop gas station and appears in its surveillance video at 3:13 a.m. The person in red and the person in the tricolored jacket exit the Kia and enter the store. The Kia leaves the Rapid Stop, and this is the last video about which Ciula testified because they "don't track those vehicles or those individuals after that point."

{¶ 47} On cross-examination, Ciula testified that one cannot see who was inside the vehicle in the CMHA video nor can one see "actual firearms." Ciula could

not determine "where or who those rounds came from, those flashes came from." Ciula testified that "[n]o guns were visible on any of the persons of interest" in the videos.

### i. Curtiss Jones

{¶ 48} Curtiss Jones ("Jones") testified that he is the supervisor of the Trace Evidence Unit at the Cuyahoga County Medical Examiner's Office. Jones testified that he tested the "sleeve cuffs" of a red sweatshirt submitted as evidence in this case and found "elements consistent with gunshot residue . . . ." According to Jones, this "would indicate that [the red sweatshirt] was either worn by someone shooting a gun, or by a person near the shooting of a gun, or . . . there was transfer of gunshot primer residue from a surface to the sleeve cuffs." Jones testified that the red sweatshirt came to his office with a label that stated, in part, "worn by Drequan Wood."

{¶ 49} On cross-examination, Jones testified that he could not tell when gunshot residue was deposited on an item and that removing gunshot residue from clothing is more difficult than removing gunshot residue from a person's hands. The prosecutor asked Jones, "If somebody was wearing that [red] sweatshirt in a vehicle and there was a separate individual shooting in that same car, would you anticipate gunshot residue could deposit on the clothes of someone in close proximity?" Jones answered, "It could, especially if the firing of the weapon occurred where some to a majority of the residue would have actually deposited back into the car."

{¶ 50} Jones testified that he did not receive Miller's clothing, which could have been used to "tell muzzle-to-target" distance or "a determination of the distance of a weapon [from] a decedent when the shots occurred . . . ."

### j. Kristen Koeth

{¶ 51} Kristen Koeth ("Koeth") testified that she works "in the medical examiner's office in the Cuyahoga County Regional Forensic Science Laboratory in the firearms section." Koeth tested evidence submitted by the Cleveland Police associated with the homicide of Miller. Koeth testified that she test-fired a "MasterPiece Arms nine millimeter caliber pistol" twice and compared the results to "41 spent nine millimeter caliber cartridge casings" found at the scene of Miller's death. Koeth also determined that "there were three different guns" that were responsible for the 41 recovered cartridge casings.

{¶ 52} Koeth testified that "11 cartridge cases were indeed fired from the same firearm" although they were not fired from the MasterPiece Arms pistol. Koeth testified that another "five cartridge cases were fired from the same unknown firearm" that was not the MasterPiece Arms gun and was not the gun that fired the first 11 cartridge casings that she tested. Koeth tested the remaining 25 cartridge casings recovered from the scene and found that they were all fired from the MasterPiece Arms pistol.

{¶ 53} Koeth tested the lone bullet fragment recovered from the scene by Cleveland police that was introduced into evidence at Wood's trial. Koeth testified that "the examination of [this bullet fragment] revealed one fired copper jacket lead

hollow point bullet, consistent with .38 class, which includes nine millimeter, .38, and .357 caliber ammunition." Koeth also tested a "projectile" recovered by the medical examiner's office from Miller's right pelvis during his autopsy. Koeth testified that "[t]his bullet was examined and it revealed one fired copper jacket lead hollow point bullet consistent with nine millimeter caliber ammunition." According to Koeth, this bullet fragment was not fired from the MasterPiece Arms pistol. Rather, this bullet fragment was "consistent with [a] rifle produced by Glock firearms."

{¶ 54} Koeth clarified that the group of five cartridge casings fired from the same weapon were found inside Cannon's house. These five cartridge casings were consistent with having been fired from "a list of firearms" which includes, but is not limited to, a Glock. Koeth also clarified that there were two groups of cartridge casings found outside in the parking lot behind Cannon's house: 11 from an unknown firearm not consistent with a Glock and 25 from the MasterPiece Arms pistol.

### k. Mark Evans

{¶ 55} Mark Evans ("Evans") testified that he is employed by the FBI in the Northern Ohio Violent Crime Task Force as a Cellular Analysis Survey Team ("CAST") agent. Evans received records from Cleveland Police Detective Hayduk concerning two cellular phone numbers ending in 4748 and 8883 respectively, which were alleged "to be involved in an incident which occurred at [Cannon's

house] on March 2[6], 2023." Evans testified that, using cell phone towers, CAST "can show . . . an approximate location of where a cell phone was" at a given time.

{¶ 56} On March 26, 2023, at 12:17 a.m., the phone associated with 8883 pinged off of a tower north of Cleveland and made an outgoing call for 75 seconds to the phone associated with 4748, which pinged off of a tower south of Cleveland. At 1:57 a.m., both phones pinged off of the same tower south of Cleveland. From 2:19 a.m. to 2:51 a.m., both phones utilized the same tower "in the general location of 3224 East 93rd Street in Cleveland" as evidenced by four outgoing calls shown in the records for 8883.

{¶ 57} According to Evans, from 2:51 a.m. to 3:02 a.m., the 4748 phone stays near the E. 93rd Street tower, but there were no "cellular connections" for the 8883 phone "in this window of time." Between 3:02 a.m. and 3:05 a.m., the 4748 phone made an outgoing call to a number ending in 0306. At 3:08 a.m., the 4748 phone and the 8883 phone "were utilizing the same tower in close proximity to the same time." A few minutes later, both phones were moving north and utilizing the same towers from 3:13 a.m. to 3:18 a.m. At 4:32 a.m., the 4748 phone was "north of Harvard Avenue." At 4:43 a.m., the 8883 phone was using a "tower south of Harvard Avenue."

{¶ 58} Evans testified that between 2:55 a.m. and 2:57 a.m., both phones "could have gone past" Cannon's house.

### l. Gabrielle Zilich

{¶ 59} Gabrielle Zilich ("Zilich") testified that she is a crime analyst for the Cuyahoga County Prosecutor's Office. Zilich testified that she reviewed cell phone records for the 4748 phone, which is associated with Creer, and the 8883 phone which is associated with Wood. Zilich also reviewed records for a cell phone number ending in 4010, which is associated with Pettaway.

### m. Brandon Abercrombie

{¶ 60} Abercrombie testified that he was carrying a firearm in the early morning hours of March 26, 2023 but he did not know what kind of firearm it was. According to Abercrombie, he got the gun from his brother. Abercrombie was not carrying the gun on his person. Rather, the gun was in a book bag, which he kept near him.

{¶ 61} Abercrombie testified that while he and Miller were playing video games, he "can see like blinds in the curtains fly" and "bullets coming through the wall and debris flying everywhere." According to Abercrombie, "probably like about three, four seconds after" he heard the gunshots, he "returned fire and ran upstairs." Cannon and Alston were on the stairs, heading up, when Abercrombie fired his weapon. According to Abercrombie, "the top half of the house was also getting shot at, so they was just on the stairs." Miller was "angled going to the stairs." Abercrombie testified that Miller "crossed in front" of him and headed toward the stairs before he "returned fire."

{¶ 62} Abercrombie testified that when he "returned fire," he was facing the back of the house, which is from where the bullets were coming. "I can see the bullets coming through the window and the door and hitting the wall and microwave and stuff like that." Abercrombie's testimony continued: "I'm sitting on the couch and I'm — like if I was to look straight, I'm looking at the back door. So like as soon as I pick my head up, I can see what's going on. They ran upstairs and I just stood up and I started shooting back." Abercrombie testified that, to his knowledge, Miller "was already hit" when Abercrombie fired his weapon. Asked if it was "possible one of your bullets struck" Miller, Abercrombie replied, "It's a possibility."

{¶ 63} Abercrombie testified that he "never" intentionally caused harm to Miller. Abercrombie further testified that he only shot toward the back of the house and fired "[p]robably about like five, six rounds." Abercrombie testified that, after he fired his weapon, he heard Cannon "and everybody saying [Miller] got hit." Abercrombie picked Miller up and took him to the bathroom. According to Abercrombie, he called 911 and "told them what was going on," then put his gun under the bed because he "was scared." Abercrombie clarified that he and Smith called 911 separately but at the same time.

{¶ 64} Abercrombie told the police that morning at the scene, and in an interview later that day, that someone else "returned fire" and it was not him because he was afraid he would "catch some charges with this gun." Abercrombie testified that what he told the police was not true.

{¶ 65} On cross-examination, Abercrombie testified that, despite one of the shell casings being found near the front door of Cannon's house, he never turned around and shot toward the front of the house. Abercrombie also agreed that his testimony was the "first time any of us [in the courtroom] have heard this . . . narrative of what took place in March of 2023." Abercrombie testified that the book bag in which he carried his gun "stayed on the side of the couch," but he could not explain why it was not in any of the pictures or videos taken at the scene. Abercrombie testified that eventually the gun he used that night was sold.

{¶ 66} On redirect examination, the prosecutor asked Abercrombie, "If the gunfire hadn't gone through that apartment, would you have ever grabbed the gun out of the backpack?" Abercrombie answered, "No, sir."

**n. Eric Strick**

{¶ 67} Eric Strick ("Strick") testified that he works for the crime scene unit of the Cleveland Division of Police. On March 28, 2023, Strick was part of a team that executed a search warrant at 1124 E. 67th Street. Strick testified that he recovered a "red sweat outfit," including a red sweatshirt, from this house. He also recovered several 9 mm "black handgun magazines" and a MasterPiece Arms 9 mm firearm that was hidden in a hole in a wall. Strick swabbed the gun for DNA. Strick further testified that they found several pieces of mail addressed to Wood at this address.

**o. Kasharra Rivera-Hill**

{¶ 68} Kasharra Rivera-Hill ("Rivera-Hill") testified that she met Wood, who she knew as "Sav," "shortly after" March 26, 2023. According to Rivera-Hill, Wood

picked her up at a gas station on Kinsman in a gray Kia. Rivera-Hill testified that Wood's Kia was distinctive because it started with a "cell phone charger." Wood and Rivera-Hill went to Wood's house where Rivera-Hill "did his hair." Asked if she touched "any firearms that day," Rivera-Hill answered, "Yeah, I did." She testified that while she was doing Wood's hair, there was a gun on the floor in the living room and she moved it towards Wood. Rivera-Hill further testified that Wood "held" the gun that day, and she also saw the gun on the backseat of the Kia. Rivera-Hill identified Wood's house and the Kia from photographs the State showed her at trial. She also identified the gun that she touched and saw at Wood's house and in the Kia from a picture of the MasterPiece Arms pistol that the police found in a wall at Wood's house.

{¶ 69} On cross-examination, Rivera-Hill testified that she only knew Wood "over the course of three or four days . . . ."

### p. Marissa Esterline

{¶ 70} Marissa Esterline ("Esterline") testified that she is a forensic scientist in the DNA department at the Cuyahoga County Regional Forensic Science Laboratory. Esterline testified that she processed evidence related to Miller's death, including a "red Nike hooded sweatshirt" and DNA standards from Miller, Wicks, Rivera-Hill, Wood, Creer and Pettaway. Esterline testified that there was a "match" between DNA found on the "interior sleeve cuffs" of the red sweatshirt and Wood's DNA and a match between DNA found on the sweatshirt and Rivera-Hill's DNA.

According to Esterline, "[n]o statistical support for a match was identified" between DNA found on the sweatshirt and Miller, Wicks, Pettaway or Greer.

{¶ 71} Esterline further testified that touch DNA obtained from the MasterPiece Arms gun found in Wood's house matched Wood's DNA and Rivera-Hill's DNA. The DNA from the MasterPiece Arms pistol did not match the DNA of Miller, Wicks, Pettaway or Creer. Esterline testified that there "was an insufficient amount of human DNA" found on the 41 cartridge casings recovered from the scene of the shooting to develop a DNA profile for comparison.

### q. Alison Krywanczyk

{¶ 72} Dr. Alison Krywanczyk ("Dr. Krywanczyk") testified that she is a deputy medical examiner at the Cuyahoga County Medical Examiner's Office. Dr. Krywanczyk performed Miller's autopsy and testified about an "entrance gunshot wound" on Miller's abdomen. Dr. Krywanczyk testified that she recovered a bullet from Miller's body. "So there was one gunshot wound. It entered that sort of left groin, lower abdomen area and passed across his pelvis and embedded in the soft tissue next to his sacrum or the tailbone. So it sort of went from left to right and then stopped its course there." According to Dr. Krywanczyk, the bullet "injured [Miller's] left internal iliac artery," which is the "branching of the aorta as it reaches into the pelvis."

{¶ 73} Dr. Krywanczyk testified about two minor "abrasions" found on Miller's body near the gunshot wound, which she noted were "unusual" and

"trauma." Dr. Krywanczyk testified that she could not "necessarily speak to" the "significance" of the abrasions.

{¶ 74} According to Dr. Krywanczyk, Miller's cause of death was "a gunshot wound to the pelvis with visceral, vascular, and skeletal injury" and the manner of death was homicide. The path that the fatal bullet traveled was "front to back, left to right, and slightly downward . . . ."

{¶ 75} Additionally, Dr. Krywanczyk determined that there was no "stippling on the surrounding skin and no soot deposited within or around the wound" on Miller's body. Stippling and soot are two things that may, or may not, be present on "the person's skin surrounding the gunshot wound," and they can help determine the "range of fire." Dr. Krywanczyk explained that not finding stippling or soot on a decedent's body could mean one of two things: "The muzzle could have been either far enough away from the individual that neither soot or stipple material made it to the skin or there could have been clothing on the person or another intervening object that prevented it from being deposited on the skin." Dr. Krywanczyk testified that "most weapons at a distance greater than two feet will not leave soot or stippling." Dr. Krywanczyk agreed that, in this case, the "muzzle-to-target distance was undetermined."

### r. Andrew Hayduk

{¶ 76} Andrew Hayduk ("Hayduk") testified that he is a homicide detective with the Cleveland Police Department. He was assigned to investigate the death of Miller on March 26, 2023. Hayduk testified that, based on the police report and

body camera videos from the responding officers, this incident "stemmed from a shooting into a habitation."

{¶ 77} Hayduk met with the CMHA Police Department and retrieved "the darker video that captured the shooting from the vehicle into the house." Hayduk also worked with Piscitello to track "that vehicle kind of driving through that parking lot" behind Cannon's house that is seen in the CMHA video. According to Hayduk, the police "believed [the vehicle] was a Kia SUV, possibly a sport." Hayduk testified as follows about information he learned from Piscitello:

> Actually, while we were pulling this video after I had sent her those photographs of the car, she advised just a couple of minutes after this incident a short distance on Kinsman Road on 55th the car pulls into a Shell gas station. And we then move to that Shell gas station to see if anyone had gotten out of the car or if there was any evidentiary value in the video at Shell gas station.
>
> . . .
>
> Again, we went to the Shell gas station and we reviewed their video and we could see that the Kia, it parked at a gas pump. It was pump three. And an individual got out of the front passenger seat and walked into the gas station passing under their cameras and I was able to again download and save that video that again appeared to have the correct times and save that.

{¶ 78} Hayduk testified that from the videos he saw, it did not appear that the Kia had a license plate. Hayduk learned, through his investigation, that the Kia was a "stolen vehicle." From the videos, Hayduk determined the Kia's whereabouts around the time of the shooting. Prior to the shooting, the Kia appears in videos on E. 93rd Street at the "Kinsman party center." After the shooting, the Kia traveled west on Kinsman.

{¶ 79} According to Hayduk, video from the Shell gas station showed an individual wearing "a grayish G-Star hoodie" get out of the front passenger seat of the Kia and walk into the store. Hayduk testified that "[t]here's a clear face shot of this individual." Utilizing photos taken from the video, Hayduk was able to identify this individual as Creer. Hayduk testified that, in addition to Creer in the gray hoodie, two other individuals were seen in the Kia. The "driver of the vehicle consistently throughout was wearing an all red outfit with black shoes. I believe it's a Nike Hoodie . . . . There was also a[n] individual who was wearing a red, white, and blue kind of puffy jacket that was very distinct that was also consistently moving in and out of the back seat of the vehicle." According to Hayduk, these three individuals "interacted" with each other. "They appear to be together again moving in and out of that car at that Kinsman party center prior to the homicide."

{¶ 80} After stopping at the Shell gas station, the Kia stops at the Rapid Stop gas station further north on E. 55th Street. Hayduk collected another video from this gas station. "In the Rapid Stop video, that same Kia eventually backs into a parking spot. But the male in all red and the male in the red, white, and blue coat exit that vehicle and go into the Rapid Stop and are caught on camera." Hayduk "saved stillshots of those individuals from the Rapid Stop and Shell video[s]," and showed these photos to Cannon, Alston and Abercrombie "in an attempt to identify the suspects." Cannon knew one of the individuals as "Sav" and she had been to his house. Cannon also had a phone number and an Instagram account for "Sav." According to Hayduk, Cannon "believed [Sav's] first name might be Drequan."

{¶ 81} Hayduk viewed the Instagram account attributed to "Sav" and saw "a photograph of Sav in a driveway of a house wearing the same clothing that we see here." Sav is holding "a large amount of money" in his hands and there is "a firearm in his waistband that's kind of pulling down his waist on this right side." Hayduk testified that the firearm was a "nine-millimeter" and had an "extended magazine" which means it holds more rounds of ammunition than typical magazines. Hayduk testified that "[a]t this house that is behind Sav in this photograph, that's where we executed the search warrant and recovered a firearm and magazine."

{¶ 82} According to Hayduk, Cannon also identified Pettaway as the individual "in the tricolored jacket," whom she knew as "Dre," from a photograph that Hayduk showed her. Hayduk was able to get Pettaway's Instagram account and his phone number. Cannon identified Creer, who she knew as "Juice," from another police photo and she gave Hayduk a cell phone number and Instagram account for him.

{¶ 83} Hayduk testified that Alston gave the police the same information that Cannon had concerning Wood, Pettaway and Creer.

{¶ 84} Hayduk testified that he was in charge of executing the search warrant at Wood's home on March 28, 2023. Officers recovered "that red outfit . . . in and around the laundry basket in [Wood's] bedroom . . . ." and also recovered several magazines that were "capable of holding nine-millimeter rounds." Hayduk had an arrest warrant for Wood and "SWAT found him in an attic or crawl space above his bedroom." Rivera-Hill was present at Wood's house when the police executed the

search warrant. Hayduk further testified that the police "located a nine-millimeter MasterPiece Arms firearm in a hole in the wall in [Wood's] house."

{¶ 85} Hayduk testified that when a Kia is started using "an iPhone charging cord," it means that "the vehicle is most likely stolen."

{¶ 86} Hayduk interviewed Wood at the police station following Wood's arrest. According to Hayduk, after showing Wood video footage of Wood getting into and out of the Kia, Wood admitted to driving the Kia in the early morning hours of March 26, 2023, "with people he knew as Juice and Dre," but Wood "denied being involved in any kind of shooting."

{¶ 87} Hayduk testified that "Creer was picked up on a traffic stop" on April 26, 2023. After viewing the videos, Creer also admitted being in the Kia around the time of Miller's murder. According to Hayduk, Creer said he was "very drunk and he had fallen asleep and at some point woke up to gunfire."

{¶ 88} Pettaway was taken into custody on July 12, 2023 and Hayduk interviewed him. Pettaway identified himself in the videos but denied knowing the other two males who were in the Kia that morning.

{¶ 89} Hayduk testified that "early on in the investigation" he learned that Wicks had threatened the occupants of Cannon's home on March 25, 2023. Hayduk interviewed Wicks and "was able to essentially eliminate . . . Wicks as being . . . involved directly in the shooting of this house."

{¶ 90} According to Hayduk, Creer's "social media accounts" included "a video . . . of the three suspects together . . . ." Hayduk testified that he viewed this

video on March 30, 2023.  In this video, Creer was "dressed in the same G-STAR hoodie" and Wood and Pettaway were also "wearing the same clothing that they were wearing when this incident happened." Hayduk further testified that the words "Free Sav" can be seen in the video.

{¶ 91} On cross-examination, Hayduk agreed that neither he nor any of "the responding officers made any efforts to knock on doors in this CMHA property" to determine if there were any eyewitnesses to the shooting.  Hayduk testified that, although he had "suspicions," he first learned "100 percent" that Abercrombie fired a gun inside Cannon's house that morning when Abercrombie testified at trial. Hayduk also testified on cross-examination that the CMHA video showed "all kinds of light reflecting off the windows" of Cannon's house but he did not "believe" these lights were muzzle flashes.

{¶ 92} On redirect examination, Hayduk testified about the "muzzle flashes" seen in the CMHA video coming from the Kia that drove past the back of Cannon's house.  "I believe in that video there's two sources of gunfire, one from the kind of back and one from the front — well, two from the back, two from the front on the driver's side of that car."

## III.  Law and Analysis

### a.  Jury Instructions

{¶ 93} In his first assignment of error, Wood argues that the trial court should have given the jury an instruction on "independent intervening cause of death."  Specifically, Wood cites *State v. Dukes*, 2011-Ohio-6849, ¶ 47 (11th Dist.),

and argues that "this instruction is merited 'if the sole and only cause of death was something else or someone else . . . .'" According to Wood, this jury instruction applies in this case because "the victim's death was most likely caused by Brandon Abercrombie." Wood's argument continues as follows:

> The State's theory of the case was that [Wood] and his co-defendants had shot into the home and caused or attempt[ed] to cause injury to the occupants. The cause of death in this matter is a bullet that cannot be linked to any shots fired from outside of the home. Brandon Abercrombie's actions of shooting [Miller] were an intervening cause of death. Even if that was not a definitive conclusion, the jury should have been allowed to make the determination.

{¶ 94} During a sidebar at trial, the parties raised issues regarding jury instructions. Concerning "independent intervening cause of death," defense counsel, collectively, stated that their theory of the case "is that, hey, somebody else shot and killed [Miller] and we're not responsible." Ultimately, defense counsel requested the "independent intervening cause of death" jury instruction.

{¶ 95} At the sidebar, the prosecutor argued as follows:

> [T]he defendants are responsible for all the foreseeable and natural consequences of the commission of either discharge into a habitation or felonious assault.

> So one of the natural and foreseeable results is somebody could try to defend themselves and in the process of defending themselves, there could be injury inflicted on somebody in the area.

{¶ 96} The trial court denied defense counsel's request for an independent intervening cause of death jury instruction.

{¶ 97} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are

relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 2015-Ohio-492, ¶ 46, quoting *State v. Comin*, 50 Ohio St.3d 206, 210 (1990). "In general, a trial court should give a requested jury instruction if it is a correct statement of the law, is applicable to the facts of the particular case and reasonable minds might reach the conclusion sought by the instruction." *State v. Echevarria*, 2018-Ohio-1193, ¶ 28 (8th Dist.). A court "may refuse to give an instruction as to a matter which is not applicable to the facts governing the case." *State v. Scott*, 26 Ohio St.3d 92, 101 (1986). A defendant must show "that he or she was prejudiced by the trial court's refusal to give a requested jury instruction" for this court to find an abuse of discretion. *Id.* at ¶ 29.

{¶ 98} *Ohio Jury Instructions*, CR § 417.25 states in part as follows:

3. INDEPENDENT INTERVENING CAUSE OF DEATH . . . . If the defendant inflicted an injury not likely to produce death, and if the sole and only cause of death was . . . fatal injury inflicted by another person . . . the defendant who inflicted the original injury is not responsible for the death.

{¶ 99} R.C. 2903.02(B) defines felony murder as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree . . . ." In this case, Wood was convicted of improperly discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), which is a second-degree felony offense of violence and serves as the predicate offense for his felony murder conviction. *See* R.C. 2901.01(A)(9)(a) (listing R.C. 2923.161 as an "offense of violence").

{¶ 100} In *State v. Dukes*, 2011-Ohio-6849 (11th Dist.), which is the only case that Wood cites to support his argument, the defendant argued that the trial court erred by failing to instruct the jury regarding independent intervening cause of death. *Dukes* at ¶ 42. The *Dukes* Court found that the trial court did not err by failing to give the requested instruction because "the evidence presented at trial was not sufficient to require that the instruction be given." *Id.* at ¶ 47. In *Dukes*, the victim sustained "a significant spinal cord injury" after the defendant knocked the victim to the ground and twisted the victim's neck. *Id.* at ¶ 7, 9. The victim was paralyzed and unable to breathe on his own. *Id.* at ¶ 16. The victim was placed on a ventilator. *Id.* at ¶ 12. The victim decided he wanted the ventilator removed and, when this was done, the victim "died about ten to twelve hours later . . . ." *Id.* at ¶ 11.

{¶ 101} The *Dukes* Court found that "there is no support in the record for the proposition that [the victim's] decision to remove the ventilator was the 'sole and only cause of death.'" *Id.* at ¶ 47. Rather, evidence in the record showed that "but for the spinal cord injuries [the victim] would not have required the use of a ventilator." *Id.* at ¶ 49. Specifically, the medical examiner who performed the autopsy testified that the victim "'died from complications of the spinal cord injury due to blunt force trauma to the neck,' and that the victim's death was proximately caused by the injuries he received" when Dukes twisted his neck. *Id.* at ¶ 16. The *Dukes* Court further held as follows:

> Given that the circumstances requiring [the victim] to use a ventilator were the "direct effect" of the injuries inflicted on him, the removal of the ventilator cannot constitute the "sole and only cause of death."

> Thus, while the removal of the ventilator may constitute an intervening cause, it does not constitute an independent, intervening cause so as to relieve Dukes of responsibility for [the victim's] death.

*Id.* at ¶ 56.

**{¶ 102}** Upon review, we find that the facts surrounding Miller's death in this case are different than the facts in *Dukes*. Here, the alleged "independent intervening cause of death" was not medical treatment. Rather, it was Abercrombie's return gunfire.

**{¶ 103}** More apropos to Wood's arguments in this case, Ohio courts have determined that the Ohio legislature's intent when drafting the felony murder statute was "to adopt a proximate cause standard of criminal liability" as evidenced by the wording in the statute "as a proximate result of." *State v. Dixon*, 2002 Ohio App. LEXIS 472 (2d Dist.).

> Under the "proximate cause theory," it is irrelevant whether the killer was the defendant, an accomplice, or some third party such as the victim of the underlying felony or a police officer. Neither does the guilt or innocence of the person killed matter. Defendant can be held criminally responsible for the killing regardless of the identity of the person killed or the identity of the person whose act directly caused the death, so long as the death is the "proximate result" of [the d]efendant's conduct in committing the underlying felony offense; that is, a direct, natural, reasonably foreseeable consequence, as opposed to an extraordinary or surprising consequence, when viewed in the light of ordinary experience.

*Id. See also State v. Jennings*, 2017-Ohio-8224 (8th Dist.) (citing *Dixon* with approval and affirming the defendant's felony murder conviction when one of the victims shot and killed the defendant's co-conspirator during an armed robbery).

**{¶ 104}** In *State v. Ervin*, 2006-Ohio-4498 (8th Dist.), this court applied the proximate cause standard outlined in *Dixon* to affirm the defendant's felony murder conviction after the defendant's kidnapping victim was shot and killed by an FBI agent.

> The intervening act of [FBI Special Agent] Werth shooting at the driver of the vehicle was the most immediate and obvious cause of [the victim's] death, but not the sole and exclusive cause. Had Ervin and [his codefendant] not kidnapped [the victim] and demanded a sum of money or drugs for his return, [the victim] would not have been shot. Had Ervin surrendered at the scheduled drop-off when the FBI SWAT team converged on his vehicle and had Ervin not driven his vehicle at Werth, [the victim, who was] the front-seat passenger, would not have been shot and killed. By kidnapping [the victim], attempting to avoid apprehension, and driving at Werth, Ervin and [his codefendant] set in motion a chain of events in which one of the reasonably foreseeable consequences was the death of [the victim]. Thus, Ervin and [his co-defendant's] conduct was a proximate cause of [the victim's] death for which Ervin is criminally responsible.

*Id.* at ¶ 25. *See also State v. Dykas*, 2010-Ohio-359, ¶ 24-25 (8th Dist.) ("A defendant cannot be held responsible for consequences that no reasonable person could expect to follow from his conduct, but he will be held responsible for consequences that are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience . . . . Only a reasonably unforeseeable intervening cause will absolve one of criminal liability in this context.").

**{¶ 105}** Upon review, we find that the requested instruction is a correct statement of law. However, it is not applicable to the facts of this case given that Wood was charged with felony murder. Under felony murder, the direct or immediate cause of death is irrelevant if the proximate cause of death is the

defendant's commission of the underlying felony. *See Dixon, Jennings* and *Ervin*. Furthermore, Abercrombie testified that, but for "the gunfire" coming from behind Cannon's house, he would not have "grabbed" his gun out of his backpack.

{¶ 106} Applying this "but for" test, Abercrombie's return gunfire was not the sole and only cause of Miller's death. Shots that Wood fired from behind Cannon's house "set in motion a chain of events" that led to Miller's death. In other words, whether Abercrombie's bullet killed Miller does not absolve Wood of criminal liability here.

{¶ 107} Accordingly, Wood's first assignment of error is overruled.

### b. Motion to Dismiss Felony Murder Charge

{¶ 108} In his second assignment of error, Wood argues that the court should have dismissed the felony murder charge against him "on the basis that the charge was not issued by the grand jury with full knowledge of the facts in the matter; mainly, that the grand jury was not privy to evidence that Brandon Abercrombie fired the shot that killed" Miller.

{¶ 109} In *State v. Vitale*, 96 Ohio App.3d 695, 699 (8th Dist. 1994), this court quoted Section 10, Article I of the Ohio Constitution, which states in part that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury," and held that "[t]his provides an inalienable protection to the defendant that he will be tried on the same essential facts on which the grand jury found probable cause." In *State v. Headley*, 6 Ohio St.3d 475, 478-479 (1983), the Ohio Supreme Court held that this constitutional

provision "guarantees the accused that the essential facts constituting the offense for which he is tried will be found in the indictment of the grand jury . . . . Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury."

{¶ 110} As stated earlier in this opinion, the elements of felony murder are as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree . . . ." R.C. 2903.02(B). Wood's indictment for felony murder states as follows: Wood "did cause the death of Derrion Miller, as a proximate result of [Wood] committing or attempting to commit an offense of violence that is a felony of the first or second degree, to wit: improperly discharging a firearm at or into a habitation, in violation of [R.C.] 2923.161(A)(1) . . . ."

{¶ 111} Upon review, we find that the fact that Abercrombie fired a gun that morning, and it is possible, if not probable, that one of his shots killed Miller is not an "essential fact constituting the offense" of felony murder. As our review of Wood's first assignment of error shows, even if Abercrombie's gun fired the fatal shot, this does not absolve Wood of criminal liability. Furthermore, information known at the time Wood was indicted included that five cartridge casings were found inside Cannon's home, indicating that someone inside her home fired a gun. Additionally, Koeth testified that the bullet fragment recovered from Miller's body

during the autopsy was "consistent with nine-millimeter caliber ammunition" but was not fired from the MasterPiece Arms pistol. Rather, this bullet fragment was "consistent with rifle produced by Glock firearms."

{¶ 112} In other words, only the identity of the person who returned fire from inside Cannon's home was unknown at the time of the indictment. The identity of this shooter is not an "essential fact" of felony murder, and we cannot say that Wood's indictment violates Section 10, Article I of the Ohio Constitution. Accordingly, Wood's second assignment of error is overruled.

### c. Sufficiency of the Evidence

{¶ 113} In his third assignment of error, Wood argues that "there is insufficient evidence that the death of [Miller] was the proximate result of [Wood] committing Improper Discharge into a Habitation," there was insufficient evidence "that the apartment was the permanent or temporary habitation of any victim with the exception of Ms. Cannon," there was insufficient evidence that Wood "discharged a firearm during this incident" and there was insufficient evidence that Wood "aided and abetted in the offense."

{¶ 114} A challenge to the sufficiency of the evidence supporting a conviction requires a determination of whether the State has met its burden of production at trial. *State v. Hunter*, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Thompkins* at 386.

{¶ 115} "An appellate court's function when reviewing the sufficiency of evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince a reasonable juror of the defendant's guilt beyond a reasonable doubt." *State v. Balinski*, 2022-Ohio-3227, ¶ 43 (8th Dist.). *See also State v. Bankston*, 2009-Ohio-754, ¶ 4 (10th Dist.) ("[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the State's witnesses testified truthfully and determines if that testimony satisfies each element of the crime.").

### i. Felony Murder

{¶ 116} Wood's argument that the State presented insufficient evidence to convict him of felony murder focuses on proximate cause and foreseeability. Specifically, Wood argues that Abercrombie's "actions were not natural or logical within the scope of any risk created by" Wood. We again turn to *State v. Dixon*, 2002 Ohio App. LEXIS 472 (2d Dist.), which addressed the following issue: "whether a defendant can be convicted of felony murder for the death of his accomplice when that killing was committed by the intended victim of the underlying felony offense in the course of resisting that crime." Because the facts of this case are slightly different than the facts in *Dixon*, we rephrase the issue to: whether a defendant can be convicted of felony murder for the death of one intended victim when that killing may have been committed by another intended victim in the course of resisting that crime.

**{¶ 117}** The underlying felony in *Dixon* was aggravated robbery and the court analyzed whether the death of the victim, whose name was Lightfoot, could have been "'reasonably anticipated by an ordinarily prudent person as likely to result from the circumstances created by the defendant in the commission of a felony . . . .'" *Id.*, quoting *State v. Bumgardner*, 1998 Ohio App. LEXIS 3856 (2d Dist.).

> Clearly, the shooting which killed Lightfoot was within the scope of the risk created by Dixon when he and Lightfoot robbed the Jiffy Lube at gunpoint. . . . The natural inclination of persons present during a robbery to forcibly defend themselves, their family and friends, and their property from theft and criminal aggression is a primal human instinct. Every robber or burglar knows when he attempts his crime that he is inviting dangerous resistance. Add to this highly charged atmosphere the use of a firearm to facilitate the robbery, and the risk of serious physical harm or death to any person present, be it the intended victims, bystanders, or the wrongdoers themselves, becomes highly foreseeable.

(Citations omitted.) *Id.*

**{¶ 118}** Upon review, we find that this reasoning from *Dixon* is applicable to the case at hand. The underlying felony here is improperly discharging a firearm into a habitation. It is foreseeable, natural and logical that someone may get shot and killed when dozens of bullets are fired into an occupied house. As such, the State presented sufficient evidence that Miller's death was the proximate result of improperly discharging a firearm into a habitation.

### ii. Improperly Discharging a Firearm at or Into a Habitation

**{¶ 119}** R.C. 2923.161(A) governs improperly discharging a firearm at or into habitation, and subsection (1) states that "[n]o person . . . shall knowingly . . .

[d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual . . . .”

{¶ 120} Our review of the record shows that the following evidence was presented at trial. The MasterPiece Arms gun used to fire at least 25 bullets into Cannon's house was found hidden in a wall in Wood's house, and the gun had Wood's DNA on it. Wood is captured on videos driving the Kia shortly before and shortly after the shooting. Gunshot residue was found on the sleeve of the red sweatshirt Wood was wearing while he was driving the Kia. Rivera-Hill testified that she saw the MasterPiece Arms gun in Wood's house and in the Kia "shortly after" March 26, 2023. The CMHA video showing "muzzle shots" coming from the Kia as it is driving by Cannon's home is not clear enough to identify whether this car is the Kia. However, it certainly could be the Kia. Furthermore, videos and cell phone mapping evidence put the Kia in the vicinity of Cannon's house at the time of the shooting. The RTCC videos show the Kia approaching this area immediately prior to the shooting and leaving this area immediately after the shooting.

{¶ 121} We hold that this evidence is sufficient to establish that Wood fired the MasterPiece Arms gun into Cannon's home in the early morning hours of March 26, 2023. There is no need to address Wood's argument regarding aiding and abetting because the evidence is sufficient to show that he was a principal offender in the commission of this felony.

{¶ 122} We turn to Wood's argument that the evidence was insufficient to convict him of five counts of improperly discharging a firearm into a habitation. The

indictments for the five counts of improperly discharging a firearm into a habitation reference "an occupied structure that is a permanent or temporary habitation of" Miller, Abercrombie, Smith, Cannon and Alston respectively. In other words, there is one count for each person inside Cannon's house when the shooting occurred. Wood argues on appeal that the "State presented no evidence that the apartment was the permanent or temporary habitation of any victim with the exception of Ms. Cannon." Upon review, we find that whether the house was the "habitation" of Miller, Abercrombie, Smith and Alston is irrelevant because this court has held that "a violation of R.C. 2923.161(A)(1) occurs when an offender fires a gun into someone's habitation, regardless of the presence of people." *State v. Grayson*, 2017-Ohio-7175, ¶ 8 (8th Dist.). The *Grayson* Court further explained as follows:

> Similar to burglary, improperly discharging a firearm into a habitation "is not defined in terms of conduct toward another person." *State v. Allen*, 8th Dist. Cuyahoga No. 82618, 2003-Ohio-6908, ¶ 21. The "victim," so to speak, of a burglary is the occupied structure. Ohio courts have held that "the burglary offenses punish trespasses into structures." *State v. Marriott*, 189 Ohio App.3d 98, 2010-Ohio-3115, 937 N.E.2d 614, ¶ 29 (2d Dist.). *See also State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 67 (it is the defendant's "entry into the dwelling with the requisite intent that constitutes the crime" of burglary).

*Id*. at ¶ 9. *See also State v. Adkins*, 2011-Ohio-5149, ¶ 41 (8th Dist.) ("Should the state prevail in its argument that a defendant may be convicted on more than one count of burglary based upon the number of persons present in the residence when the defendant entered, it would turn 500 years of burglary law on its head. It would

transform burglary from an offense against the sanctity of the dwelling house into an offense against the person.")

{¶ 123} Upon review, we find that the State did not present sufficient evidence to support five counts of improperly discharging a firearm into a habitation because there is no evidence that Wood shot into five habitations. Rather, the State presented evidence that Wood shot into Cannon's house. This evidence supports Wood's conviction of Count 6, which states that he "knowingly, without privilege did discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of Shardasia Cannon." Wood's four other convictions of violating R.C. 2923.161(A) are not supported by sufficient evidence in the record.

{¶ 124} Accordingly, Wood's third assignment of error is overruled, in part, and sustained, in part. Wood's conviction of improperly discharging a firearm into a habitation in Count 6 is affirmed. Wood's convictions of improperly discharging a firearm into a habitation in Counts 3, 4, 5 and 7, including the attendant one-, three- and five-year firearm specifications, are vacated. At sentencing the trial court merged Wood's conviction for all five counts of improperly discharging a firearm into a habitation into his conviction for felony murder, and the State elected to proceed to sentencing on the felony murder charge. Nonetheless, the court sentenced Wood to a consecutive term of three years in prison for a firearm specification attendant to his improperly discharging a firearm into a habitation conviction on Count 3. Because we are vacating Wood's conviction for Count 3, including the firearm specifications, we must also vacate Wood's three-year prison

sentence imposed for a firearm specification in Count 3. We remand this case to the trial court for the limited purpose of holding a resentencing hearing.

### d. Manifest Weight of the Evidence

{¶ 125} In his fourth assignment of error, Wood argues that his convictions are against the manifest weight of the evidence for the same reasons that they were not supported by sufficient evidence, as addressed in our review of assignment of error three. Additionally, Wood argues that his convictions should be reversed because "many of the State's eyewitnesses are admitted liars."

{¶ 126} A manifest weight of the evidence challenge attacks the credibility of the evidence presented and questions whether the State met its burden of persuasion. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.). Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins*, 78 Ohio St.3d 380, at 386-387. When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of . . . conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Furthermore, in *State v. Jordan*, 2023-Ohio-3800, ¶ 17, the Ohio Supreme Court held that "[s]itting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion."

{¶ 127} In a manifest weight challenge, the appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*

{¶ 128} In Wood's appellate brief, he states in a conclusory fashion that he "incorporates his arguments from Assignment of Error III" into his fourth assignment of error. We, also in a conclusory fashion, find that his convictions for felony murder, one count of improperly discharging a firearm into a habitation and having weapons while under disability are supported by the manifest weight of the evidence in the record for the same reasons detailed in our analysis of Wood's third assignment of error.

{¶ 129} We turn to Wood's argument that "many of the State's eyewitnesses are admitted liars." Specifically, Wood argues that Cannon and Abercrombie lied to police at or near the time of the shooting and they lied while testifying during Wood's trial. For example, Cannon told police that she did not know who was shooting from inside her house and she initially testified at trial that she did not know who fired those shots, but ultimately she admitted on the witness stand that she learned that Abercrombie fired the shots the "same day" as the shooting.

{¶ 130} Wood argues that Abercrombie lied to police when he told them that an individual who was not even present in Cannon's house that morning "returned fire" during the shooting. Wood further argues that Abercrombie's testimony during trial was inconsistent in two minor instances. For example, Abercrombie testified that he gave the gun he used in the shooting to someone to sell and also testified that someone else gave the gun he used in the shooting to another person to sell. According to Wood, the "evidence and testimony in this matter is rife with inconsistencies and self-serving lies," such that the jury lost its way in convicting him of Miller's murder.

{¶ 131} Ohio courts consistently hold that a jury is "in the best position to assess the credibility of the witnesses who testified at trial" and is free to believe all, part or none of each witness' testimony. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.). "The jury was in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections that are critical observations in determining the credibility of a witness and his or her testimony." *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.). *See also State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.) (A "defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory.").

{¶ 132} Accordingly, Wood's fourth and final assignment of error is overruled.

{¶ 133} Judgment affirmed, in part, and vacated, in part. Case remanded to the trial court for the limited purpose of holding a resentencing hearing consistent with this opinion.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

LISA B. FORBES, J., CONCURS;
KATHLEEN ANN KEOUGH, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)


KATHLEEN ANN KEOUGH, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 134} I concur with the majority's decision to affirm Wood's convictions on Counts 1 and 5 but respectfully dissent from the majority's decision to vacate Wood's convictions of improperly discharging a firearm into a habitation and the attendant firearm specifications, as charged in Counts 2, 3, 4 and 6.

{¶ 135} This issue first arose in the context of a Crim.R. 29 motion for acquittal, raised by Wood's codefendant, Pettaway, who argued that the phrase "temporary habitation" is not defined and further argued that

> [t]here is zero evidence whatsoever that Derrion Miller made that townhouse a permanent or temporary habitation of his own. He did not live there . . . . there's also no evidence whatsoever that [Kaevonna Smith] intended to make that structure a temporary or permanent habitation . . . . Count 7 is with regards to Shaniya Alston. Again, no evidence whatsoever that she intended to make that a permanent or temporary habitation.

(Tr. 1295-1297.)

{¶ 136} Both Wood and Creer joined Pettaway's Crim.R. 29 motion. Over objection, the jury instructions provided:

> [Y]ou must find beyond a reasonable doubt that on or about the 26th Day of March, 2023, in Cuyahoga County, Ohio, the Defendant and/or Defendants did knowingly, without privilege did discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of:
>
> In Count Two: Derrion Miller;
> In Count Three: Brandon Abercrombie, Jr.;
> In Count Four: Kaevonna Smith;
> In Count Five: Shardasia Cannon;
> In Count Six: Shania Alston.

{¶ 137} Crim.R. 29 motions are reviewed using the same standard as that used in reviewing the sufficiency of the evidence. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.). The majority relies on an argument not specifically raised or even fully developed by the parties, in reversing four of Wood's convictions, contending that only one person's home was shot into. I disagree.

{¶ 138} Rather, I find that Cannon's residence was a "temporary habitation" for the other victims. Although it does not appear that there is any case law exploring the precise meaning of "temporary habitation" as it applies to R.C. 2923.161, I would find that the State presented sufficient evidence upon which the jury could have concluded that the townhouse was a "temporary" habitation of the other victims. While I recognize that this offense applies whether or not somebody is present in the house, I do not think this distinction affects the fact that one dwelling may be a habitation for multiple different people, or that each of the 41 bullets fired had the potential to harm one or more of the victims who called Cannon's home their "temporary habitation" for the evening.

{¶ 139} R.C. 2923.161(D) provides that "occupied structure" has the same definition as in R.C. 2909.01, the arson and related offenses definition section. This section defines "occupied structure" as

> any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:
>
> (1) It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.
>
> (2) At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.
>
> (3) At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.
>
> (4) At the time, any person is present or likely to be present in it.

{¶ 140} The Ohio Supreme Court has held that the definitions of "occupied structure" are read in the disjunctive, and that the State need only prove one of the four definitions to fit the definition of "occupied structure." *State v. Wilson*, 58 Ohio St.2d 52, 57 (1979). There is no doubt that Cannon's home was an "occupied structure." However, R.C. 2923.161(A)(1) provides that the occupied structure must be either the permanent *or* temporary habitation of *any* individual.

{¶ 141} "Temporary habitation" is also a separate element of the offense and "temporary" was not specifically defined for the jury,[2] nor did the jury request clarification or definition of the term during deliberations. *See, e.g., State v. Blanton*, 2021-Ohio-65, ¶ 12 (8th Dist.). The ordinary meaning of "temporary" is "one serving for a limited time." *See* https://www.merriam-webster.com/dictionary/temporary [https://perma.cc/ZWB5-8XPT]. At the time of the shooting, it was already the early hours of the morning. Cannon, Abercrombie, Smith, Alston, and Miller spent the entire evening together, and Smith's children were with their grandmother for the evening. Smith fell asleep on the couch. Everyone was getting comfortable in the home. None of the testimony implied that any of the victims had gone to Cannon's home with the intention of leaving or not spending the night. Therefore, there was evidence in the record upon which the jury could have inferred that the victims intended to sleep at Cannon's

---

[2] "Habitation" was defined for the jury as "the place where a person lives." (Tr. 1352.) The defendants all objected to this definition. Other Ohio case law has defined a habitation as a dwelling place or domicile. *See State v. K.L.P.W.*, 2017-Ohio-5671, ¶ 11 (12th Dist.); *State v. Snyder*, 2011-Ohio-175, ¶ 13 (9th Dist.).

home, making it their "temporary habitation" in the same way that sleeping at a hotel for an evening makes it a "temporary habitation" because one is inhabiting the hotel room for a "limited time."

{¶ 142} Additionally, the Fifth District considered a situation where an individual was indicted for each number of bullets shot into a home. *See State v. McConnell*, 2023-Ohio-654 (5th Dist.). In *McConnell*, the defendant was charged with 23 counts of discharging a firearm into a habitation in violation of R.C. 2923.161(A)(1), and the jury returned a conviction on all counts and the Fifth District affirmed the convictions. *Id.* at ¶ 15 and 61. It is not unreasonable then, in this case, where 36 bullets were shot from the outside of a home, that each bullet that could have, and one indeed did, harm a potential victim, was charged as an individual count.

{¶ 143} Since I find that the State presented sufficient evidence to support Wood's convictions and the jury could have inferred from the evidence received that the home was a temporary habitation of the other victims, I respectfully dissent in part and would affirm Wood's convictions in their entirety.